IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

| | |
|---|---|
| TATTOO ART INK, INC.,<br>    Plaintiff, | )<br>)<br>) |
| v. | ) |
| TAT INTERNATIONAL, LLC, | ) Case No. 2:10 CV 323<br>)<br>) JURY DEMANDED |
| and | )<br>) |
| KIRK A. KNAPP,<br>    Defendants, | )<br>) |

MEMORANDUM IN SUPPORT OF MOTION TO DISQUALIFY ATTORNEY

Pursuant to Local Civil Rule 83.1(I) and Virginia Rule of Professional Conduct 3.7, defendants TAT International LLC and Kirk A. Knapp, by their attorneys, have moved to disqualify Mark R. Baumgartner as plaintiff's attorney and for all other appropriate relief.

In support of their motion, TAT International and Mr. Knapp state that:

FACTS

1. Mark R. Baumgartner, the attorney for plaintiff Tattoo Art Ink, Inc., is a necessary fact witness in this case. He is likely to testify at trial on behalf of Tattoo Art, Inc. and, in any event, will be called as an adverse witness by the defense. As such, Mr. Baumgartner's participation in this matter as an advocate is prohibited pursuant to Local Rules and the rules of professional conduct.

2. Tattoo Art Ink creates and distributes--through sales and licenses--tattoo designs. It is owned and operated by Joseph Dufresne, also known as J.D. Crowe.

3. TAT International is an airbrush art supplier that sells artwork and supplies to create temporary tattoos. It is owned and operated by Kirk Knapp.

1

4. In late 2005, Mr. Crowe contacted Mr. Knapp to license his designs to TAT International for royalty payments.

5. On December 28, 2005, Mr. Crowe and Mr. Knapp spoke for nearly two hours on the telephone. During that conversation, they reached a verbal agreement whereby Tattoo Art would license some of its designs to TAT International in exchange for royalties.

6. On December 29, 2005, Mr. Baumgartner, Tattoo Art Ink's attorney, prepared a licensing agreement and faxed it to Knapp. On page one of the agreement, there was a blank space for the date to be entered when the agreement was executed. An accompanying cover letter stated "please let me know if this is acceptable, and I will send a hard copy to you for your signature."

7. On December 29, 2005, Mr. Knapp read the agreement, found certain provisions of it to be unacceptable, and made notes on his received copy. On December 30, 2005, Mr. Knapp called Mr. Crowe to discuss five areas of the agreement that needed to be revised. Mr. Knapp and Mr. Crowe talked at length about Mr. Knapp's revisions to the agreement. Regarding at least one of Mr. Knapp's concerns that was discussed (a minimum annual royalty that was not discussed during the December 28, 2005 conversation), Mr. Crowe stated that he did not ask for the minimum annual royalty provision, that Mr. Baumgartner inserted it into the agreement, and that Mr. Crowe did not require a minimum annual royalty guarantee.

8. When the December 30, 2005 conversation concluded, Mr. Knapp and Mr. Crowe reached agreement about all issues. Mr. Crowe agreed to incorporate Mr. Knapp's revisions and asked him to fax the signature page of the agreement. On December 29, 2005, Mr. Baumgartner agreed that he would forward him a hard copy of the final agreement for his signature.

9. The faxes exchanged between the parties were sent from and to Mr. Baumgartner's law office. With one exception, they bear Mr. Baumgartner's facsimile telephone number and are time and date stamped.

10. Mr. Baumgartner did not send Mr. Knapp a hard copy of the licensing agreement. Until this dispute arose, Mr. Knapp did not see an executed copy of the agreement. Based upon his conversations with Mr. Crowe, Mr. Knapp understood that all issues were addressed and resolved and were the subject of a mutual agreement.

11. The parties proceeded under the revised licensing agreement until early 2007 when Mr. Knapp received a notification from the United States Bankruptcy Court for the Eastern District of Virginia advising him that J.D. Crowe filed for Chapter 7 bankruptcy. As a result, TAT International believed that Mr. Crowe and his business were bankrupt and ceased paying royalties on the minimal sales of Tattoo Art Ink's designs. Over two years passed without further instruction from the Bankruptcy Court and without correspondence or contact from Mr. Crowe or Tattoo Art Ink.

12. In early 2009, Mr. Crowe contacted Mr. Knapp to inquire why royalty payments were not made. Mr. Knapp explained that minimal royalties were due, that he received the bankruptcy filing, and that he was waiting for instructions from the Bankruptcy Court. Mr. Crowe stated that he did not file for bankruptcy.

13. On May 14, 2009, Mr. Baumgartner sent TAT International a letter terminating the licensing agreement.

14. Mr. Knapp communicated with Mr. Baumgartner to acknowledge receipt of the termination letter and to request a copy of the executed revised licensing agreement. Mr. Baumgartner stated that he would send a copy but did not. Mr. Knapp contacted Mr.

Baumgartner's office several times to obtain a copy of the executed revised licensing agreement. Mr. Knapp did not receive a copy until this lawsuit was initially filed.

15. After May 14, 2009, TAT International paid Tattoo Art Ink all past due royalties, amounting to $1,675.68.

16. On July 2, 2010, Tattoo Art Ink filed this suit against TAT International and Mr. Knapp, alleging that violations of the licensing agreement and copyright infringement. TAT International and Mr. Knapp answered the complaint, denied all material allegations, and asserted affirmative defenses including fraud in the execution of the license agreement.

17. A core issue in this case concerns contract formation. Tattoo Art contends that the agreement attached to its complaint is the operative contract between the parties. TAT International and Mr. Knapp contend that the revised agreement--negotiated by Mr. Knapp and Mr. Crowe and sent to Mr. Baumgartner for finalization--is the operative contract.

18. As a result of this critical factual dispute, Mr. Baumgartner is a necessary witness in this case and will be called to testify about contract formation, about Mr. Knapp's repeated requests for an executed copy of the final agreement, and about his failure to provide the agreement.

ARGUMENT

Local Civil Rule 83.1 adopts the Virginia Rules of Professional Conduct for all cases in this District. Virginia Rule of Professional Conduct 3.7 prohibits a lawyer from acting as an advocate in an adversarial proceeding when the lawyer is likely to be a necessary witness except where the testimony relates to an uncontested issue, the testimony relates to the nature and value of legal services rendered, or disqualification of the lawyer would work a substantial hardship on the client.

4

The roles of an advocate and a witness are inconsistent. An advocate zealously advances and argues the cause of another. A witness submits evidence objectively and without argument. *Estate of Andrews v. United States*, 804 F.Supp. 820, 823 (E.D. Va. 1992). Given the potential conflicts of interest that fulfilling these two roles create, the prohibition on serving as a witness and advocate is a prophylactic rule designed to protect the interests of the client, the adverse party, and the institutional integrity of the legal system as a whole. *Id*. at 823. Because of the substantial interests that the witness/advocate rule is intended to protect, application of the rule is mandatory and cannot be waived by an adverse party or be the subject of client consent. *Id*. at 824.

Mark Baumgartner is inextricably involved in most or all of the transactions that are the basis of the complaint and the affirmative defenses. Whether there is liability in this case turns upon whether there is a contract, the delivery of the contract, the terms of the contract, the negotiation of the contract, the revisions to the contract was revised, the acceptance of the revisions, and termination of the contract.

There are three witnesses to issues-– Mr. Crowe, Mr. Knapp, and Mr. Baumgartner. The testimony of these witnesses is necessary to determine the terms of the contract and the understanding of the parties about those terms. At a minimum, Mr. Baumgartner has necessary evidence about:

(a) the history and the whereabouts of the complete, countersigned, and revised agreement, and

(b) about what happened to the parties' revisions to the agreement, why they are not incorporated in the purported agreement attached to the complaint, and whether and when the agreement was delivered to TAT International and Mr. Knapp.

None of this evidence is privileged. If there is any privilege at issue, Tattoo Art's initiation and pursuit of this lawsuit would waive the privilege. Mr. Baumgartner's testimony is not limited to uncontested matters. His disqualification will not work a substantial hardship on Tattoo Art at this early stage of litigation. His testimony obviously may be prejudicial to Tattoo Art.

## CONCLUSION

The Code of Conduct 3.7(b) bars Mr. Baumgartner's representation of Tattoo Art in this lawsuit. The Court should grant the motion to disqualify.

> TAT INTERNATIONAL, LLC and KIRK A. KNAPP
>
> By: /s/ David N. Ventker
> _____
> Of Counsel
>
> **DAVID N. VENTKER** (VSB #29983)
> **VALERIE B. HUBER** (VSB #71090)
> VENTKER & WARMAN, PLLC
> 101 West Main Street, Suite 810
> Norfolk, VA 23510
> Telephone: 757.625.1192
> Facsimile: 757.625.1475
> dventker@ventkerlaw.com
>
> **GREGORY A. ADAMSKI**
> Adamski & Conti LLC
> 100 N. LaSalle Street
> Chicago, Illinois 60602
> Telephone: 312.332-7800
> gaadamski@adamskiandconti.com
>
> *Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 10, 2010, a true and correct copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will then send notification of such filing to Mark R. Baumgartner, Esquire, at the law offices of Pender & Coward, P.C. , 222 Central Park Avenue, Suite 400, Virginia Beach, VA 23462-3026.

/s/ David N. Ventker
**DAVID N. VENTKER (VSB #29983)**
VENTKER WARMAN, PLLC
101 West Main Street, Suite 810
Norfolk, VA 23510
Telephone: 757-625-1192
Facsimile: 757-625-1475