UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division



FILED

FEB 28 2011

CLERK, US DISTRICT COURT
NEWPORT NEWS, VA

TATTOO ART, INC.,
A Virginia Stock Corporation,

    Plaintiff,

v.                          Civil Action No. 2:10cv323

TAT INTERNATIONAL, LLC,
A Michigan Limited Liability
Company,

and

Kirk A. Knapp, Individually,

    Defendants.

## OPINION AND ORDER

This matter is currently before the Court on a motion filed by plaintiff Tattoo Art, Inc. ("Tattoo Art" or "plaintiff"), a Virginia corporation, for partial summary judgment as to liability against defendants TAT International, LLC ("TAT"), a Michigan limited liability company, and Kirk A. Knapp, the principal and sole member[1] of TAT (collectively, the

---

[1] For purposes of establishing subject-matter jurisdiction on the basis of diversity of citizenship, a limited liability corporation is not considered a citizen of its state of incorporation or principal place of business, as a corporation is, but instead shares the citizenship of its members. Gen. Tech. Applications, Inc. v. Exro Ltda, 388 F.3d 114, 120 (4th Cir. 2004). Plaintiff did not allege in its complaint the identity or citizenship of TAT's membership, but instead only alleged TAT's state of organization and principal place of

"defendants"). The motion has been fully briefed, and the Court heard oral argument on the motion on February 11, 2011. For the reasons stated herein, the Court **GRANTS** plaintiff's motion. Thus, plaintiff's affirmative case during the bench trial in this matter, which is currently scheduled to commence tomorrow, will relate only to the amount of damages owed to plaintiff by defendants.

## I.   FACTS

Plaintiff is in the business of creating, copyrighting, licensing, and selling "tattoo flash" artwork designs. Defendants are in the business of creating and selling stencils for use in applying airbrush body art. Defendants do not dispute plaintiff's ownership or copyright registration of the "books" of tattoo flash (i.e., sheets of tattoo artwork designs) at issue in this matter.

### A.   The License Agreement between the Parties

Plaintiff contends that on December 29, 2005, plaintiff and TAT entered into a written license agreement (the "Agreement")

---

business. See Compl. ¶ 2. Plaintiff also failed to allege explicitly the citizenship of Knapp. See id. ¶ 3. However, it does not appear to be disputed that diversity of citizenship does, in fact, exist in this case, and defendants' counsel confirmed to the Court during oral argument on February 11, 2011 that Knapp is the sole member of TAT and a citizen of Michigan. Consequently, pursuant to 28 U.S.C. § 1653, plaintiff is hereby **ORDERED** to amend its complaint to include the requisite jurisdictional allegations. Jaffe-Spindler Co. v. Genesco, Inc., 747 F.2d 253, 255 n.1 (4th Cir. 1984); see also Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826, 830-31 (1989).

granting TAT the exclusive right to create and sell stencils derived from sixteen pages of plaintiff's designs (the "designs") that were attached to the Agreement. Although defendants concede that such a license agreement came into existence around that time, defendants deny that the Agreement attached as Exhibit A to plaintiff's complaint constitutes the final agreement between the parties, and instead maintain that, in the absence of any definitive written agreement, the operative agreement between the parties was merely an oral one. Specifically, defendants claim that on December 29, 2005, plaintiff faxed defendants the draft Agreement, and on the following day, December 30, 2005, the parties negotiated several changes to the terms of the draft Agreement telephonically. Defendants also claim that, in the course of those negotiations, plaintiff represented that it would prepare a revised agreement reflecting the agreed changes, and that Knapp signed the signature page of the draft Agreement and faxed it back to plaintiff with the understanding that his signature would be attached to the revised Agreement, of which he would receive a copy. Defendants further claim that plaintiff and plaintiff's counsel never made the agreed changes to the Agreement, that defendants never received any revised version of the Agreement, and, in fact, never received a copy of <u>any</u> signed version of the Agreement prior to the dispute arising between the parties.

3

**B.   The Parties' Performance pursuant to the Agreement**

Despite this claimed absence of a final written agreement, both parties performed as if there was an agreement for over a year without incident.  Defendants admit that they suspended all royalty payments to plaintiff in early 2007, but claim that they did so due to a case of mistaken identity, believing that a bankruptcy notice they received relating to an individual named John Daley Crowe actually related to plaintiff, whose principal is legally named Joseph Dufresne, but goes by the name J.D. Crowe.

**C.   Defendants' Alterations to Plaintiff's Copyrighted Designs**

At an indeterminate point prior to May 14, 2009—defendants claim it to be some time in 2008—defendants began changing the coloring of certain of plaintiff's designs and publishing the re-colored images on TAT's website, purportedly because plaintiff's designs were not selling well with their original coloring.  Defendants also removed plaintiff's copyright information from the re-colored images.

Defendants admit that they undertook these actions without notifying plaintiff or securing plaintiff's permission. Defendants claim, however, that they believed the (oral) Agreement between the parties permitted these alterations.  In this connection, defendants ostensibly rely on the precise language in Article VIII of the (written) Agreement, which

4

authorized TAT not only to "sell," but also to "design . . . advertise," and "promote" the articles licensed by the Agreement; namely, the airbrush stencils. Defendants apparently claim that this provision corresponds exactly to the oral agreement they advocate, and that they interpreted the authority to "design" the stencils to include the ability to re-color plaintiff's designs and advertise and promote such re-colored versions of plaintiff's designs on TAT's website in order to promote and sell TAT's airbrush stencils for those designs. Defendants emphasize in this connection that the re-colored versions of plaintiff's designs were merely used for advertising purposes, and that the actual products TAT was selling—the stencils themselves—contained no coloring, at all.

### D.  Plaintiff's Termination of the Agreement

On May 14, 2009, after plaintiff had contacted and communicated with defendants regarding defendants' failure to make royalty payments for over a year, plaintiff sent TAT a letter terminating the Agreement based on TAT's failure to report sales and pay royalties, as well as its unauthorized alterations to the coloring of plaintiff's designs. The termination letter directed TAT to cease and desist all reproduction and sale of plaintiff's designs, demanded an accounting of sales conducted pursuant to the Agreement, and requested that TAT contact plaintiff's counsel.

E.   **TAT's Actions after Receiving the Cease-and-Desist Letter**

Knapp acknowledged receipt of the cease-and-desist letter, but defendants continued to publish the re-colored versions of plaintiff's designs on TAT's website and sell the stencils they had derived from plaintiff's designs.   Defendants claim that they believed they were permitted, under the oral changes they proposed to the Agreement on December 30, 2005, to continue disposing of their remaining inventory even after receiving the cease-and-desist letter terminating the Agreement.   By Knapp's own admissions in his deposition testimony, however, it appears clear that TAT did, in fact, fail to pay all royalties when due to plaintiff, provide quarterly reports of sales of stencils derived from plaintiff's designs, and account accurately for all sales of such stencils, as required by the Agreement.

## II.  PROCEDURAL HISTORY

The instant matter is, in fact, the second lawsuit plaintiff has filed to enforce the Agreement against defendants. On July 7, 2009, plaintiff filed a complaint in this Court, Civil Action No. 2:09cv314, alleging that TAT had breached the terms of the Agreement, and that both TAT and Knapp had infringed plaintiff's copyrights.[2]   Although defendants answered

---

[2] Plaintiff's previous complaint also named Raser, Inc., TAT's internet service provider, as a defendant.   Raser was dismissed from the prior case by agreed order on October 27, 2009.

there, as here, that, _inter alia_, the version of the Agreement relied upon by plaintiff did not reflect certain changes agreed to by the parties, defendants nevertheless filed a motion to dismiss premised on the mandatory mediation provision contained in the (written) Agreement.   After briefing and a hearing on December 21, 2009, this Court granted defendants' motion to dismiss by Opinion and Order dated May 14, 2010.   The parties thereafter submitted the matter to mediation, but were unable to resolve their dispute.

Plaintiff filed its complaint in this matter on July 2, 2010, again alleging causes of action for breach of the parties' license agreement and copyright infringement, and requesting damages, attorney's fees, costs, and a permanent injunction. Defendants answered the complaint on August 11, 2010.

On September 10, 2010, defendants filed a motion to disqualify plaintiff's counsel Mark R. Baumgartner pursuant to Local Civil Rule 83.1 of this Court and Virginia Rule of Professional Conduct 3.7, on the ground that Mr. Baumgartner's intimate involvement in the negotiation of the Agreement renders him a necessary witness in any trial in this matter.   Plaintiff filed its opposition to that motion on September 23, 2010, and defendants filed their reply on September 29, 2010.   On October 7, 2010, a hearing on that motion was held before United States Magistrate Judge Douglas E. Miller.   After hearing the arguments

of counsel, Judge Miller denied the motion, and a written Order was subsequently filed on October 18, 2010.

Plaintiff filed the instant motion for partial summary judgment and a brief in support on December 10, 2010. Defendants filed their opposition on December 21, 2010, and plaintiff filed its reply on December 24, 2010.  Judge Miller held the Final Pretrial Conference on February 11, 2011.  As noted above, the Court heard oral argument on the instant motion later that same day.  On February 18, 2011, defendants filed a notice withdrawing their demand for trial by jury, and on February 21, 2011, plaintiff filed a notice consenting to the withdrawal.  As noted above, the bench trial in this matter is currently scheduled to commence tomorrow.

### III. STANDARD OF REVIEW

#### A.   Summary Judgment

Summary judgment is appropriate when the Court, viewing the record as a whole and in the light most favorable to the non-moving party, determines that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  Although the initial burden obviously falls upon the moving party, once the movant has properly filed evidence supporting summary judgment, the non-

8

moving party may not rest upon the mere allegations of the pleadings, but instead must set forth specific facts in the form of exhibits and sworn affidavits illustrating a genuine issue for trial. Celotex, 477 U.S. at 322-24; Cray Commc'ns, Inc. v. Novatel Computer Sys., Inc., 33 F.3d 390, 393-94 (4th Cir. 1994). In other words, while the movant must carry the burden to show the absence of a genuine issue of material fact, when such burden is met, it is up to the non-movant to establish the existence of such an issue. Celotex, 477 U.S. at 322-23. When considering the non-moving party's submissions, "the facts and all reasonable inferences must be viewed in the light most favorable to the non-moving party." Smith v. Va. Commonwealth Univ., 84 F.3d 672, 675 (4th Cir. 1996) (en banc).

In determining whether the non-moving party has established the existence of a genuine issue of material fact, facts must be deemed "material" if they are necessary to the resolution of the case and "genuine" if they are based on more than speculation or inference. Thompson Everett, Inc. v. Nat'l Cable Adver., L.P., 57 F.3d 1317, 1323 (4th Cir. 1995). If, after reviewing the record, it appears that a "reasonable jury could return a verdict for [the non-movant], then a genuine factual dispute exists and summary judgment is improper." Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 958-59 (4th Cir. 1996); see also Anderson, 477 U.S. at 250 ("The inquiry performed is

9

the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.").

### B. Plaintiff's Copyright Infringement Claim

As the United States Supreme Court has explained, "[n]ot all copying . . . is copyright infringement. Instead, to establish infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991) (citing Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 548 (1985)); accord CoStar Group, Inc. v. LoopNet, Inc., 373 F.3d 544, 549 (4th Cir. 2004) (quoting Feist, 499 U.S. at 361). With respect to the first element, "[a] certificate of registration issued by the Copyright Office is 'prima facie evidence of the validity of the copyright and of the facts stated in the certificate,' such as ownership. When such a certificate exists, the burden shifts to the defendant to prove that the claimed copyrights are invalid." Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc., 618 F.3d 417, 428 (4th Cir. 2010) (quoting 18 U.S.C. § 410(c)) (internal citation omitted). With respect to the second element, a plaintiff may prove that a

defendant copied the original elements of the plaintiff's copyrighted work either by direct evidence of copying or by a presumption, supported by indirect evidence, that defendant had access to the copyrighted work and that the defendant's work is substantially similar to plaintiff's copyrighted work. <u>Id.</u> at 435.

### C.   Plaintiff's Breach of Contract Claim

With respect to plaintiff's breach of contract claim, because the instant motion requires the Court to interpret the Agreement's provisions, the Court must first, as a threshold matter, determine which law governs such interpretation. Article XIII of the December 29, 2005 version of the Agreement contains an express choice-of-law provision stating that the Agreement "shall be construed in accordance with the laws of the Commonwealth of Virginia," and no party disputes that this provision was part of the agreement between the parties, whether written or oral. Of course, the enforceability of this choice-of-law provision depends on the applicable choice-of-law rules. Subject-matter jurisdiction in the instant lawsuit is purportedly based on the existence of both a "federal question" pursuant to 28 U.S.C. § 1338, the statute conferring exclusive jurisdiction upon the federal courts in copyright infringement suits, and complete diversity of citizenship among the parties pursuant to 28 U.S.C. § 1332. Consequently, the Court turns to

11

the choice-of-law rules of the forum state to examine the Agreement's choice-of-law provision. <u>See</u> <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496-97 (1941); <u>Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.</u>, 155 F. Supp. 2d. 1, 13 (S.D.N.Y. 2001) ("Because jurisdiction in this case is based on diversity of citizenship as well as the presence of a federal question, we follow the choice of law rules of . . . the forum state."), <u>aff'd in part on other grounds and remanded</u>, 277 F.3d 253 (2d Cir. 2002).

Here, because the action was filed in a federal court located in Virginia, the Court looks to Virginia's choice-of-law rules. "Virginia law looks favorably upon choice of law clauses in a contract, giving them full effect except in unusual circumstances . . . ." <u>Colgan Air, Inc. v. Raytheon Aircraft Co.</u>, 507 F.3d 270, 275 (4th Cir. 2007) (quoting <u>Hitachi Credit Am. Corp. v. Signet Bank</u>, 166 F.3d 614, 624 (4th Cir. 1999)); <u>see also</u> <u>Hooper v. Musolino</u>, 364 S.E.2d 207, 211 (Va. 1988); <u>Tate v. Hain</u>, 25 S.E.2d 321, 324 (Va. 1943). The parties do not claim, nor does it otherwise appear, that any such unusual circumstances exist in this case. Accordingly, this Court will apply Virginia contract law when interpreting the provisions of the Agreement. Under Virginia law, "'[t]he elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or

12

breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation.'" <u>Sunrise Continuing Care, LLC v. Wright</u>, 671 S.E.2d 132, 136 (Va. 2009) (quoting <u>Filak v. George</u>, 594 S.E.2d 610, 614 (Va. 2004)).

## IV.  ANALYSIS

### A.  Plaintiff's Copyright Infringement Claim

Plaintiff has provided certificates of registration for its designs, which serve as prima facie evidence of the validity of plaintiff's copyrights, and defendants do not dispute their validity.  Plaintiff also provides direct evidence of copying in the form of Knapp's own deposition testimony, in which he admitted that he caused the coloration of plaintiff's designs to be changed, and the re-colored images to be published on TAT's website, without notifying or securing permission from plaintiff.  Consequently, defendants' pre-termination liability for copyright infringement depends entirely on whether re-coloring plaintiff's designs and publishing such re-colored images on TAT's website could reasonably constitute "design" within the meaning of Article VIII of the Agreement.  As plaintiff points out, however, Article VIII's reference is to "design" of the "Licensed Articles," which Article 1.02 defines as "Stencils for use in applying airbrush body art."[3]  In this

---

[3] No party disputes that Article 1.02 was part of the Agreement between the parties.

connection, defendants' own argument works against them: since the stencils themselves are not colored, but merely <u>uncolored</u> outlines derived from the silhouettes of plaintiff's designs, re-coloring the <u>images</u> of plaintiff's designs for publication on TAT's website cannot reasonably constitute "design" <u>of the</u> <u>stencils</u>. Instead, as plaintiff suggests, defendants' control over the "design" of the stencils would extend to, for example, the material out of which the stencils were constructed, and not to the coloring of plaintiff's copyrighted designs themselves. Consequently, defendants' re-coloring of plaintiff's designs was beyond the scope of the license granted by the Agreement, and therefore constitutes copyright infringement.

Defendants' post-termination liability for continuing to display the re-colored images after receiving the cease-and-desist letter, of course, further depends on whether the Agreement was, in fact, amended to remove the prohibition on liquidation of existing inventory in cases of termination due to breach. Because the Court has concluded, as discussed in further detail below, that the December 29, 2005 version of the Agreement constitutes the agreement of the parties under applicable principles of Virginia contract law, the Agreement does not contain the claimed amendment removing such prohibition. Consequently, defendants' continued display of the

re-colored images after receiving the cease-and-desist letter also constitutes copyright infringement.

It should be noted here that even if the Court were to believe that defendants acted innocently in this regard, defendants' actions would nevertheless constitute infringement. See, e.g., Microsoft Corp. v. Grey Comp., 910 F. Supp. 1077, 1083 (D. Md. 1995) (citing, inter alia, Fitzgerald Publ'g Co. v. Baylor Publ'g Co., 807 F.2d 1110, 1113 (2d Cir. 1986)). "Intention to infringe is not essential under the [Copyright] Act." Microsoft Corp. v. Comp. Serv. & Repair, Inc., 312 F. Supp. 2d 779, 784 (E.D.N.C. 2004) (quoting Buck v. Jewell-La Salle Realty Co., 283 U.S. 191, 198 (1931)). In a similar vein, whether or not defendants' infringement was committed willfully is not a question of liability, but instead a matter of statutory damages pursuant to 17 U.S.C. § 504. See, e.g., Lyons P'ship, L.P. v. Morris Costumes, Inc., 243 F.3d 789, 799–800 (4th Cir. 2001) (noting that other United States Courts of Appeals have held infringement to be willful for purposes of enhanced statutory damages when a defendant acted with actual or constructive knowledge that his actions constituted infringement or recklessly disregarded a copyright holder's rights).

It appears from the foregoing discussion that plaintiff has presented undisputed evidence to establish that defendants infringed plaintiff's copyrights, both before and after

15

plaintiff terminated the Agreement. Consequently, summary judgment in plaintiff's favor as to defendants' liability for copyright infringement is appropriate.

### B. Plaintiff's Breach of Contract Claim

#### 1. This Court's Opinion and Order in the Prior Case

With respect to the existence and nature of the Agreement, plaintiff argues that this Court's May 14, 2010 Opinion and Order in the previous lawsuit "was explicitly (and necessarily) based upon the existence of a written agreement between the parties; an agreement that the Court enforced to the benefit of the Defendants," quoting the Court's statement in that Opinion and Order that "'[o]n December 29, 2005, Tattoo Art and TAT entered into a licensing agreement . . . .'" Docket No. 28 at 11 (quoting Tattoo Art, Inc. v. TAT Int'l, LLC, 711 F. Supp. 2d 645, 647 (E.D. Va. 2010)). Plaintiff argues that the doctrines of collateral, equitable, and judicial estoppel all preclude defendants from disputing in this lawsuit the existence of the Agreement when they secured dismissal of the previous lawsuit against them by invoking the Agreement's mandatory mediation provision.

Defendants admittedly tread an extremely fine line in this case, as they did in the prior case, between selectively relying for some of their arguments on the precise language of the written Agreement—such as the mandatory mediation provision—and

insisting that only an oral agreement between the parties existed, hoping thereby to create material factual disputes and defeat plaintiff's instant motion.  It is true that defendants have pled from the very first, both in this case and in the prior case, that the written Agreement attached to the complaint does not constitute the agreement of the parties.  The Court also notes that Judge Miller correctly observed at the hearing on defendants' motion to disqualify plaintiff's counsel that this Court's May 14, 2010 Opinion and Order in the prior case did not expressly adopt the version of the Agreement attached to the complaint in the prior case as the definitive agreement between the parties.

### 2.  The Defendants' Burden in Opposing Summary Judgment

Nevertheless, this matter is currently before the Court on a summary judgment motion, not a motion to dismiss, as it was when the Court issued its May 14, 2010 Opinion and Order in the prior case.  Thus, defendants may not rest upon the mere allegations of the pleadings at the summary judgment stage, but instead must set forth specific facts illustrating a genuine issue for trial.  Celotex, 477 U.S. at 322-24.  Defendants have nowhere, even at oral argument, provided the Court with a comprehensive, specific explanation of what they believe the Agreement's terms were; they merely repeat what the Agreement's terms were not.  Defendants cannot identify which annotations on

17

Knapp's copy of the Agreement (defendants' Exhibit 1) were made contemporaneously with the December 30, 2005 conversations and which were made later—some even after litigation had begun between the parties.  In other words, defendants can point to no document that contains what they contend are the definitive terms of the Agreement.

3.   The "Objective Theory of Contract" and the Merger Clause

     This fact is problematic for defendants not only because of their burden in opposing the instant motion, but also because of the applicable Virginia law of contract and the terms of the Agreement itself.   In Virginia, the "objective theory of contract" controls.  See, e.g., Chesapeake Paper Prods. Co. v. Stone & Webster Eng'g Corp., 51 F.3d 1229, 1238 (4th Cir. 1995) (noting with approval a district court's application of "Virginia's objective theory of contracts"); Abingdon Livestock Exch., Inc. v. Smith, 594 F. Supp. 2d 688, 693 (W.D. Va. 2009) (citing Chandler v. Kelley, 141 S.E. 389, 392 (Va. 1928), for the proposition that "it is the objective manifestation of intent in a contractual relationship that governs"); Jarrett v. Goldman, 67 Va. Cir. 361, 2005 WL 1323115, at *17 (Va. Cir. Ct. May 31, 2005); JGB Indus., Inc. v. Simon-Telelect, Inc. (In re JGB Indus., Inc.), 223 B.R. 901, 906-07 (Bankr. E.D. Va. 1997), aff'd 221 B.R. 176 (E.D. Va. 1998).   "The modern test for determining whether there was acceptance [of an offer to

18

contract] (reflecting the objective theory of contract) is whether it would be clear to a reasonable person in the position of the offeror that there was an acceptance." Adams v. Doughtie, 63 Va. Cir. 505, 2003 WL 23140076, at *12 (Va. Cir. Ct. Dec. 31, 2003) (citing Green's Ex'rs v. Smith, 131 S.E. 846, 848-49 (Va. 1926)); accord Commonwealth v. Stewart, No. 04-1409, 2004 WL 2387053, at *14 (Va. Cir. Ct. Oct. 19, 2004). In this respect, Virginia law "is consistent with the definition in the Restatement Second of Contracts, defining acceptance as a manifestation of assent to the terms of the offer made by the offeree in a manner invited or required by the offer." Id. With respect to the additional requirement that there be a "meeting of the minds," the Court notes that "the law imputes to a person an intention corresponding to the reasonable meaning of his words and acts." Id. at *15.

In this connection, the Court notes that Article XIII of the Agreement contains a merger clause that explicitly disclaims any oral modifications. The presence of such a clause in the December 29, 2005 version of the Agreement, the signature page of which was admittedly the one signed by Knapp and faxed back to plaintiff, without annotation or reservations, combines with the foregoing principles of Virginia contract law to eliminate defendants' claims of agreed oral changes, even if the December 30, 2005 conversations occurred exactly as defendants claim they

did.   In  other  words,  Knapp's  signature  and  return  of  the
signature  page  of  the  Agreement  provided  to  him  by  plaintiff
constituted  an  objective  manifestation  of  TAT's  assent  to  the
draft  Agreement,  which  contained  an  explicit  provision
disclaiming  oral  modifications—including  any  purportedly  made  on
December  30,  2005.

### 4.   The Relevance of Virginia's Statute of Frauds

There  is  also  a  further  problem  with  defendants'  position
that  the  December  29,  2005  Agreement  was  not  the  definitive  one,
and  that  the  agreement  upon  which  the  parties  performed  was
instead  merely  an  oral  one.   Given  the  fact  that  the  Agreement's
initial  term  was  for  36  months  (see  Article  2.02[4]),  it  had  to  be
in  writing  to  avoid  running  afoul  of  Virginia's  statute  of
frauds,  which  requires  that  contracts  for  "any  agreement  that  is
not  to  be  performed  within  a  year"  be  "in  writing  and  signed  by
the"  parties  in  order  to  be  enforceable.   Va.  Code.  §  11-2.
This  means  that  a  mere  oral  agreement  of  the  nature  currently
advocated  by  defendants,  which  selectively  incorporated  most  of
the  terms  of  the  December  29,  2005  version  of  the  Agreement,
would  have  been  unenforceable  by  any  party  due  to  Virginia's
statute  of  frauds.   Consequently,  even  if  the  Court  did  not
explicitly  conclude  in  the  prior  case  that  the  December  29,  2005

---

[4] No  party  disputes  that  Article  2.02  was  part  of  the  Agreement
between  the  parties.

Agreement was the definitive one, defendants' invocation of the Agreement's mandatory mediation provision in the prior case necessarily implied their acceptance that the Agreement had to have been in writing. In other words, defendants could not have advocated for the enforceability of the Agreement's mandatory mediation provision in the prior case without conceding that the Agreement containing that provision was in writing. Consequently, precluding defendants from challenging the existence of a written Agreement in the instant case would be appropriate under any of the theories of estoppel advanced by plaintiff in connection with the instant motion. Cf. United States v. Bankers Ins. Co., 245 F.3d 315, 323 (4th Cir. 2001) (observing that "no party suing on a contract should be able to enforce certain contract provisions while simultaneously attempting to avoid the terms of an arbitration provision contained therein."); Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GmbH, 206 F.3d 411, 418 (4th Cir. 2000) (noting that, in the arbitration context, "[t]o allow [a party] to claim the benefit of the contract and simultaneously avoid its burdens would both disregard equity and contravene the purposes underlying enactment of the Arbitration Act.") (quoting Avila Group, Inc. v. Norma J. of Cal., 426 F. Supp. 537, 542 (S.D.N.Y. 1977)); Jackson v. Iris.com, 524 F. Supp. 2d 742, 749 (E.D. Va. 2007) ("It is an axiomatic rule of contract law that a party may

21

not 'rely on the contract when it works to its advantage, and repudiate it when it works to its disadvantage.'") (quoting Hughes Masonry Co. v. Greater Clark County Sch. Bldg. Corp., 659 F.2d 836, 839 (7th Cir. 1981)).

Defendants' failure to provide the Court with any alternative written version of the Agreement in opposition to the instant motion for summary judgment leads the Court to conclude that the December 29, 2005 version of the Agreement was the definitive one. Virginia's objective theory of contract does not appear to permit any other result.

   5.  **No Dispute as to the Material Terms or Breach Thereof**

Perhaps most important, however, is the fact that, as plaintiff points out, defendants do not dispute the provisions of the Agreement relating to the requirements to account for, report, and pay royalties to plaintiff. Consequently, notwithstanding the parties' disputes as to the minimum royalties due to plaintiff under the Agreement, or TAT's ability to continue displaying plaintiff's images and selling its remaining inventory of stencils after receiving the cease-and-desist letter, defendants fundamentally do not deny TAT's other breaches of the Agreement, but instead seek only to offer explanations for them. In this connection, plaintiff aptly notes that defendants provide no legal authority for the assertion made by defendants' counsel during oral argument that

22

receiving a notice of bankruptcy for an uninvolved third party somehow operated to suspend defendants' obligations to plaintiff under the Agreement in such a way as to prevent such suspension from constituting a breach.

On the basis of the foregoing analysis, the Court concludes that the December 29, 2005 Agreement constituted the operative agreement between the parties in this case, and that defendants' failure to account for, report, and pay certain royalties to plaintiff in a timely fashion constituted breaches of the Agreement by TAT. The Court also concludes, of course, that TAT's infringements of plaintiff's copyrights constituted additional breaches of the Agreement. Consequently, summary judgment in favor of plaintiff on its breach of contract claim is appropriate.

## V.   CONCLUSION

For all of the foregoing reasons, plaintiff's motion for partial summary judgment as to liability is hereby **GRANTED**, and plaintiff's affirmative case during the bench trial in this matter will therefore relate only to the amount of damages owed to plaintiff by defendants.

The Clerk is **DIRECTED** to send a copy of this Opinion and Order to counsel for the parties.

IT IS SO ORDERED.

```
                              _____ /s/ _____
                                        Mark S. Davis
                              United States District Judge
```

February 28, 2011
Norfolk, Virginia