UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division


FILED

JUN 29 2011

CLERK, U.S. DISTRICT COURT

TATTOO ART, INC.,
A Virginia Stock Corporation,

    Plaintiff,

v.                                    Civil Action No. 2:10cv323

TAT INTERNATIONAL, LLC,
A Michigan Limited Liability
Company,

and

Kirk A. Knapp, Individually,

    Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to this Court's Opinion and Order dated February 28, 2011, this matter was tried before the Court, as to the issue of damages only, on March 1 and 2, 2011. At the conclusion of trial, the Court instructed the parties to file proposed findings of fact and conclusions of law within two weeks from the date that the trial transcripts were made available to them. On March 24, 2011, defendants TAT International, LLC ("TAT") and Kirk A. Knapp ("Knapp" and, collectively with TAT, the "defendants") filed an unopposed motion for an extension of time to make such filing. The Court granted such motion on that same date, and the parties timely made their respective filings on March 28, 2011.

Pursuant to an Order of this Court dated June 3, 2011, an on-the-record telephonic status conference was held on June 17, 2011 to address certain legal issues that were not adequately addressed in the parties' proposed findings of fact and conclusions of law. Plaintiff filed a memorandum regarding those issues on the eve of the status conference; the Court allowed defendants until close of business on June 21, 2011 to file a response to plaintiff's memorandum, but defendants filed no response.

After consideration of the evidence offered by the parties at trial, their respective proposed findings of fact and conclusions of law, their arguments during the telephonic status conference, as well as the record of this matter as a whole, the Court now makes the following findings of fact and conclusions of law. The Court also details herein the manner in which judgment in favor of plaintiff is to be entered after the Court has issued a Final Order on plaintiff's request for attorney's fees.

## I.  PROCEDURAL HISTORY

This Court previously recounted the procedural history of the instant matter in detail in its February 28, 2011 Opinion and Order, see Docket No. 48 at 6–8, and will therefore only partially reiterate that history herein. The instant matter is the second lawsuit plaintiff Tattoo Art, Inc. ("Tattoo Art") has

2

filed against defendants TAT and Knapp. Plaintiff filed the first lawsuit in this Court, Civil Action No. 2:09cv314, on July 7, 2009. Defendants thereafter filed a motion to dismiss on the basis of a mandatory mediation provision in the license agreement between the parties, and after briefing and a hearing on December 21, 2009, this Court granted that motion by Opinion and Order dated May 14, 2010, dismissing the case without prejudice. The parties thereafter submitted the matter to mediation, but were unable to resolve their dispute.

Plaintiff filed its complaint in the instant matter on July 2, 2010, alleging (as it had in its prior lawsuit) causes of action for breach of the parties' license agreement and copyright infringement, and requesting damages, attorney's fees, costs, and a permanent injunction. Defendants answered the complaint on August 11, 2010.

Plaintiff filed a motion for partial summary judgment as to liability on December 10, 2010, which was fully briefed, and on which this Court held a hearing on February 11, 2011. By Opinion and Order dated February 28, 2011, this Court granted plaintiff's motion. As previously noted, this matter was consequently tried before the Court, as to the issue of damages only, on March 1 and 2, 2011, and the parties thereafter submitted proposed findings of fact and conclusions of law on March 28, 2011. On May 5, 2011, plaintiff filed a renewed

3

motion for a permanent injunction and the impoundment of defendants' infringing materials. Defendants filed no response. As detailed above, an on-the-record telephonic status conference was held on June 17, 2011, in connection with which plaintiff filed a memorandum on June 16, 2011.

## II. FINDINGS OF FACT[1]

### A. The Court's Credibility Determinations

To the extent that there existed unresolved factual disputes between the parties in this matter, the Court's resolution of such disputes in the findings of fact below were reached on the basis of the following general credibility determinations. The Court found the trial testimony of plaintiff's owner, Joseph M. DuFresne, to have been straightforward, consistent, and credible, and accordingly the Court affords it great weight herein. By contrast, the Court found the deposition and trial testimony of Knapp (TAT's sole member) to have been at times evasive, self-serving, implausibly vague as to both material factual issues and matters of his own personal and professional history, irreconcilably contradictory as to several material factual issues, and ultimately less

---

[1] As noted above, at the conclusion of the damages trial on March 2, 2011, the Court requested that the parties file detailed proposed findings of fact and conclusions of law. Trial Tr. vol. 2, 233:7-11 & 284:18-288:12, Mar. 2, 2011. Because neither of the submissions contained sufficient factual findings to stand alone and be entered by the Court, the Court has made such findings herein.

4

credible than that of DuFresne. Consequently, based on the substance of Knapp's testimony and the Court's close observation of Knapp's demeanor while testifying at trial, the Court affords his testimony less weight than it does to the testimony of DuFresne. In particular, the Court found Mr. Knapp's testimony about his disciplinary history, with the National Association of Securities Dealers (the predecessor to the Financial Industry Regulatory Authority, Inc.) and the United States Securities and Exchange Commission in connection with his prior career as a stock broker, to have been less than forthcoming. Compare Pl.'s Exs. 4 & 5, with Trial Tr. vol. 1, 134:8–141:13 (Knapp Test.) & 176:9–13, Mar. 1, 2011. Although that testimony obviously did not bear directly on the disputed issues in the instant matter, it certainly figured in the Court's assessment of the credibility of Mr. Knapp's testimony.

The Court found no reason to doubt the credibility of the deposition testimony admitted at trial from former TAT employees Mark VanderWel and Kelly Christine Knapp. The Court likewise found no reason to doubt the credibility of the deposition testimony admitted at trial from TAT employee Benjamin Lee Wolfe, and further found Mr. Wolfe's live testimony at trial to have been generally consistent with his deposition testimony, and ultimately very credible. Thus, the Court affords Mr. Wolfe's testimony substantial weight herein.

## B. The Parties

1. Plaintiff is a Virginia corporation in the business of creating, copyrighting, licensing, and selling "tattoo flash" artwork designs.

2. DuFresne is plaintiff's owner and the creator of its artwork, and operates under the professional name "J.D. Crowe." Trial Tr. vol. 1, 56:1—25 (DuFresne Test.).

3. Defendants are in the business of creating and selling stencils and other products for use in applying airbrush body art.

4. TAT is a Michigan limited liability company with its principal place of business in Grand Rapids, Michigan.

5. Knapp, a citizen of Michigan, is the sole member of TAT, and controls TAT's activities.

## C. Plaintiff's Method of Copyrighting His Tattoo Designs

6. DuFresne organized his tattoo designs, both for copyright registration and sale, into books (hereinafter, the "Books"), each consisting of fifty "tattoo flash sheets," each of which sheets, in turn, contain a number of individual tattoo images. Trial Tr. vol. 18:23—21:9 (DuFresne Test.) & 51:5—12.

7. DuFresne did not register the Books, or any portions thereof, as compilations or derivative works. Id. 20:16—21:22 (DuFresne Test.) & 52:18—53:25.

8.    Instead, DuFresne explained that it was his intent to register the Books as individual copyright images under a single registration, "[m]ostly because it was cheaper" than separately registering each flash sheet or the individual tattoo designs on each flash sheet.   Id. 20:24–21:6 (DuFresne Test.).   He later elaborated that the Books "were put together for sale and done in 50 sheets to just help with the cost of a copyright compared to 50 copyrights," that "[t]hey were created in the order of those flash sheets [he] created," and that "it was just a random decision to stop at 50 and call it a book."   Id. 51:5–52:7 (DuFresne Test.).

9.    DuFresne explicitly denied that the Books were organized thematically, or that he "exercised [any] artistic discretion as an artist in putting together [his] books for purposes of copyright registration."   Id. 50:11–52:9 (DuFresne Test.).   He also denied that the individual flash sheets consistently reflected a single theme, indicating that "[s]ome did, some didn't."   Id. 52:10–17 (DuFresne Test.).

10.   DuFresne sells his copyrighted tattoo designs in a variety of ways, including on an individual image basis.   Id. 19:8–12 (DuFresne Test.).

## D.    The Terms of the Parties' License Agreement

11.   On December 29, 2005, plaintiff, through its owner DuFresne, and TAT, through its sole member Knapp, entered into a written license agreement (the "Agreement").   See Compl. Ex. A.[2]

12.   The Agreement granted TAT the exclusive right to use the sixteen pages of plaintiff's copyrighted tattoo designs (the "Property") attached to the Agreement "for the manufacture, offer for sale, sale, advertisement, promotion, shipment, and distribution of" airbrush stencils derived from the Property (the "Licensed Articles").   See Compl. Ex. A ¶¶ 1.01, 1.02 & 2.01.

13.   The Property consisted of 711 individual tattoo designs, of which 212 designs were drawn from 24 of plaintiff's registered Books.   See Docket No. 42 at 1; Pl.'s Ex. 1; Tr. Exs. 1—24.   The remaining designs contained in the Property were unregistered.   However, defendants do not dispute that all 711 designs contained in the Property "were subject to a claim of copyright" by plaintiff.   See Docket No. 42 at 1.

14.   The Agreement's initial term was 36 months, to be renewed automatically for consecutive 12-month periods until either party gave notice of nonrenewal or plaintiff gave notice

---

[2] After extensive analysis, this Court previously concluded in its February 28, 2011 Opinion and Order that the copy of the Agreement attached to plaintiff's complaint as Exhibit A constituted the definitive contract between the parties.   See Docket No. 48 at 23.

of termination due to a breach of the Agreement by TAT. <u>Id.</u> ¶ 2.02.

15. The Agreement further allowed defendant TAT "to provide a link from [TAT]'s website to [plaintiff's website,] <u>www.tattoo-art.com</u>," but also provided that TAT's "inability to link to <u>www.tattoo-art.com</u> for any reason . . . shall not relieve [TAT] of any obligation(s) under this Agreement." <u>Id.</u> ¶ 2.03.

16. The Agreement provided that TAT would pay plaintiff royalties in the amount of 12.5% of "Gross Sales," which the Agreement defined as the invoiced sale price for all Licensed Articles and "packages which include Licensed Articles and also includes [sic] other items" sold by TAT, "less sales tax and shipping costs." <u>Id.</u> ¶¶ 1.06 & 3.01. The sale price for such packages was expressly to "be calculated based upon the sales price of the entire package without diminution for the cost of any other components contained in the package." <u>Id.</u> ¶ 1.06.

17. The Agreement required TAT to provide to plaintiff "[o]n or before the 25th day of April, July, October, and January . . . a full and accurate statement, certified by a knowledgeable officer as accurate, showing the quantity and Gross Sales of all Licensed Articles distributed and/or sold during the preceding three calendar months ('Calendar Quarter')." <u>Id.</u> ¶ 3.03.

18. The Agreement also required TAT to pay to plaintiff "[o]n or before the 25th day of April, July, October, and January . . . any royalties due and payable with respect to sales occurring during the preceding Calendar Quarter." Id.

19. The Agreement further provided that, notwithstanding the provisions discussed above regarding royalties, TAT would "pay a minimum annual royalty in the amount of $6,000," which was to "be paid on or before January 25 of each year for the preceding calendar year." Id. ¶ 3.04.

20. The Agreement required TAT to "keep accurate books of account and records covering all transactions relating to" the Property and/or Licensed Articles, to which plaintiff would have access, and further required TAT to "designate a symbol or number which will be used exclusively in connection with the Licensed Articles." Id. ¶ 5.01.

21. Upon expiration or termination of the Agreement, TAT was permitted to "dispose of finished Licensed Articles on hand or in process at the time of such expiration or termination, for a period of twelve (12) months thereafter, provided all further payments due with respect to that twelve (12) month period are made in accordance with the terms" of the Agreement. Id. art. VI. However, that provision did not apply "[i]n the event [the] Agreement [was] terminated by [plaintiff] due to [TAT's] breach of any term or condition of [the] Agreement." Id.

10

22. In the Agreement, TAT explicitly "acknowledge[d] that its failure . . . to cease the manufacture, sale or distribution of the Licensed Articles upon the termination or expiration of [the] Agreement" would entitle plaintiff to temporary and permanent injunctive relief. Id. ¶ 7.01.

23. TAT agreed in the Agreement "to use its best efforts to continuously, diligently and competitively design, sell, advertise, promote, distribute, inventory, and supply each of the Licensed Articles." Id. art. VIII.

24. TAT also agreed that it would "apply '© J.D. Crowe 2005' on each sheet containing the Licensed Articles." Id. ¶ 11.02.

25. The Agreement provided that it would "be deemed to have been accepted and signed in Virginia Beach, Virginia and shall be construed in accordance with the laws of the Commonwealth of Virginia." Id. art. XIII. It further provided that, in addition to mandatory mediation, TAT "consent[ed] and agree[d] to in personam jurisdiction and venue in the United States District Court for the Eastern District of Virginia, located in Norfolk, Virginia" or "the Circuit Court for the City of Virginia Beach, Virginia," depending on the nature of the dispute. Id.

26. The Agreement provided that it could "be signed in multiple counterparts," and that "[t]ransmission of signatures

11

by facsimile shall be valid and may be relied upon by the recipient of the facsimile." Id. art. XVII.

### E. TAT's Performance and Initial Breach of the Agreement

27. TAT initially appeared to perform in conformity with the terms of the Agreement, providing plaintiff with statements of Gross Sales and corresponding royalty payments for the first three Calendar Quarters of 2006. Trial Tr. vol. 1, 54:15–55:25 (DuFresne Test.) & 121:25–122:17 (Knapp Test.).

28. However, each of the successive accountings performed by defendants in connection with the prior litigation, the mediation, and the instant matter have shown those 2006 statements and royalty payments–and, indeed, any preceding accounting or accountings, despite their claims of completeness and accuracy–to have been inaccurate, each underreporting TAT's Gross Sales and underpaying the royalties actually due to plaintiff. See Tr. Exs. 47, 50–52, 54–57 & 77; Trial Tr. vol. 1, 34:1–39:5 (DuFresne Test.), 109:24–112:6 (VanderWel Test.), 117:7–10 (Knapp Test.), 132:16–133:23, 148:7–149:7 & 169:21–173:3; 188:19–190:16 (Wolfe Dep. Test.). Plaintiff demonstrated at trial that even the most recent accounting, provided by defendants in January 2011, omitted several sales of Licensed Articles, and failed to account for royalties due on certain package sales and sales of packs of "assorted stencils." See Trial Tr. vol. 1, 191:21–194:1 (Wolfe Dep. Test.); Pl.'s Exs. 6–

12

8 & Trial Tr. vol. 1, 169:21—173:12 (Knapp Test.); Pl.'s Ex. 9—13 & Trial Tr. vol. 2, 241:9—257:8 (Wolfe Test.).

29. Although TAT continued to make sales of Licensed Articles during the fourth Calendar Quarter of 2006, TAT failed to provide plaintiff with the statement of Gross Sales and corresponding royalty payment for that Calendar Quarter, which, pursuant to paragraph 3.03 of the Agreement, was due on or before January 25, 2007. Id. 58:3—5 (DuFresne Test.); 124:5—126:15 (Knapp Test.).

30. TAT thereafter provided plaintiff no further statements of Gross Sales or royalty payments, including the minimum annual royalty payments due pursuant to paragraph 3.04 of the Agreement, before plaintiff instituted litigation against defendants. Id. 58:6—7 (DuFresne Test.) & 117:7—10 (Knapp Test.).

## F.    TAT Receives a Bankruptcy Notice

31. In late March or early April 2007, defendants received a bankruptcy notice dated March 29, 2007 from the United States Bankruptcy Court for the Eastern District of Virginia relating to a TAT customer from Glen Allen, Virginia named James Dailey Crowe, also known as Dale Crowe or Dale James Crowe (the "bankruptcy notice"). See Defs.' Trial Ex. 39; Trial Tr. vol. 1, 119:17—120:3 (Knapp Test.) & 123:5—24; Trial Tr. vol. 2, 273:7—16 (Knapp Test.), Mar. 2, 2011.

13

32. Knapp testified at trial that, shortly after receiving the notice, he accessed plaintiff's website and saw that TAT's advertisement on plaintiff's website had been removed. Trial Tr. vol. 1, 117:17–19 (Knapp Test.) & 120:19–121:24.

33. Knapp's testimony in this regard was undercut by his own Exhibit 12, which shows that there was still a link on plaintiff's website to TAT's website, albeit one that apparently alternated with other links, as late as May 26, 2007, several weeks after defendants received the bankruptcy notice. Defs.' Ex. 12 at 21; accord Trial Tr. vol. 1, 117:20–118:24 (Knapp Test.) & 120:4–14 (colloquy of the Court with plaintiff's counsel).

34. Knapp testified that he interpreted this claimed removal of TAT's advertisement from plaintiff's website as indicative of a change of control at plaintiff. Id. 121–21:24 (Knapp Test.).

35. In determining how to proceed, Knapp did not seek any legal advice in connection with defendants' receipt of the bankruptcy notice, but instead relied on his own personal experience with filing bankruptcy. Trial Tr. vol. 2, 276:15–277:17 (Knapp Test.).

36. Knapp testified, both in deposition and at trial, that he believed the bankruptcy notice actually related to plaintiff, due to the similarity of the debtor's name to DuFresne's

14

professional name, J.D. Crowe. Trial Tr. vol. 1, 117:11—14 (Knapp Test.), 118:25—119:16, 120:19—121:11.

37. Knapp also testified that it was defendants' "policy at TAT International when [they] received a bankruptcy notice to never contact that individual again," and that he "didn't think [he] could legally" call DuFresne "to check if he had filed bankruptcy." Id. 121:12—15 (Knapp Test.), 128:19—21.

38. Knapp testified, both in his deposition and at trial, that TAT stopped providing the statements of Gross Sales and royalty payments required by the Agreement because of the bankruptcy notice. Id. 117:11—14, 118:25—119:16, 120:19—24. The bankruptcy notice, however, did not stop defendants from continuing to sell the Licensed Articles.

39. Knapp's testimony in this regard is manifestly incredible. The bankruptcy notice was dated March 29, 2007—over two months after the statement of Gross Sales and royalty payment for the fourth Calendar Quarter of 2006 were due. Compare Defs.' Trial Ex. 39 at 1 (bankruptcy notice dated March 29, 2007 relating to a bankruptcy case filed on March 28, 2007), Trial Tr. 119:17—120:3 (Knapp Test.) & 123:5—2, and Trial Tr. vol. 2, 272:20—273:16 (Knapp Test.) with Trial Tr. 63:1-7 (defendants' counsel representing to the Court that the bankruptcy notice "was received at or about the time the first quarter report was due in '07"), 118:25—119:16 (Knapp Dep.

Test.) ("'the only reason that [Knapp said he] stopped paying royalties is because of the bankruptcy notice'"). Thus, as a factual matter, the bankruptcy notice could not have been the reason why TAT breached its obligations under the Agreement for the fourth Calendar Quarter of 2006.[3]

40. Knapp's testimony at trial in this connection was further invalidated by the fact that it contradicted his own prior testimony. Trial Tr. vol. 1, 118:25—119:16 (Knapp Test.). Knapp agreed at his deposition that "'the only reason that [he said he] stopped paying royalties [was] because of the bankruptcy notice.'" Id. 119:12—13. At trial, however, Knapp claimed that the bankruptcy notice was only "part of the reason," but "not all the reason" why TAT stopped providing plaintiff with the required sales reports and royalty payments. Id. 117:11—16.

41. Instead, Knapp claimed that "there was a context and [he knew] it was more than that," id. 120:24—25 (Knapp Test.), and proceeded to offer additional justifications for TAT's omissions. First, Knapp claimed that TAT withheld the required statements of Gross Sales and royalty payments because TAT's "ad was removed from Tattoo Art's site." Id. 117:17—19 (Knapp

---

[3] The Court will discuss in its Conclusions of Law below the reasons why the bankruptcy notice also provided no basis for withholding subsequent statements of Gross Sales and corresponding royalty payments.

16

Test.). However, even if placement of a link to TAT's website on plaintiff's website was a term of the Agreement—which it manifestly was not—that link to TAT's website, as noted above, was still present and active on plaintiff's website months after the statement of Gross Sales and royalty payment for the fourth Calendar Quarter of 2006 were due. See Defs.' Ex. 12 at 21; accord Trial Tr. vol. 1, 117:20–118:24 (Knapp Test.) & 120:4–14 (colloquy of the Court with plaintiff's counsel). Consequently, the claimed removal of the link to TAT's website from plaintiff's website provides no justification whatsoever for TAT's omissions under the Agreement.

42. Knapp then testified that Kelly Knapp was responsible for bringing such contractual obligations to his attention, but that she inexplicably failed to do so with respect to the statement of Gross Sales and royalty payment for the fourth Calendar Quarter of 2006. Id. 122:18–123:4 (Knapp Test.), 126:10–22, 127:5–9, 133:9–134:5, 272:20–273:6 & 275:23–276:2. The Court need not determine whether it believes or disbelieves this particular excuse because, even if it were true, it would in no way alter the fact of TAT's breach of the Agreement in this connection.

G. **TAT Alters Plaintiff's Copyrighted Tattoo Designs**

43. At an indeterminate point prior to May 14, 2009—defendants claim it to be sometime during 2008, see Trial Tr.

vol. 2, 260:1—4 (Wolfe Test.) & 265:22—25—defendants undertook a project that "took the artwork provided by Tattoo Art, made derivative works by changing the colors [of plaintiff's copyrighted tattoo designs] electronically, re-laying out the posters [of plaintiff's copyrighted tattoo designs] and printing up posters called Original Collection." Trial Tr. vol. 1, 188:3—8 (Wolfe Dep. Test.); accord id. 153:13—163:22 (Knapp Test.).

44. Knapp testified that defendants undertook the Original Collection recoloring project because the images of plaintiff's copyrighted tattoo designs were not effectively selling the stencils derived from them, due at least in part to their complex coloration, which Knapp claimed to be difficult to recreate using the airbrush medium. Id. 153:13—156:18 (Knapp Test.) & 159:12—14; Trial Tr. vol. 2, 273:17—274:5 (Knapp Test.). But see Trial Tr. vol. 1, 65:21—66:13 (DuFresne Test.) (DuFresne denying that needle and ink necessarily allow artists to create more detailed tattoo images than airbrush).

45. Knapp testified at trial that, to that end, defendants derived the Original Collection not from the images of plaintiff's copyrighted tattoo designs, but instead only from the stencil silhouettes of such designs, employing TAT's own proprietary "Ray Brandt" style of coloration instead of the

original coloration of plaintiff's designs.  Id. 154:19–157:12
(Knapp Test.).

46.  Knapp testified that defendants knew at the time when
they created the Original Collection stencils that they "were
derived from J.D. Crowe and [they] knew [they] were going to
have to pay royalties on them."  Id. 165:20–23 (Knapp Test.).

47.  Knapp's testimony in this connection is belied,
however, by the fact that TAT never contacted plaintiff
regarding the development or sale of Original Collection artwork
or stencils, id. 102:1–5 (DuFresne Test.); Trial Tr. vol. 2,
282:8–283:1 (Knapp Test.) & 283:16–284:10 (DuFresne Test.), and,
as previously noted, paid no royalties for any Original
Collection-related sales before plaintiff instituted litigation
against defendants.

48.  Knapp testified that he believed defendants' creation
of the Original Collection was permissible in light of TAT's
obligation under Article VIII of the Agreement "to use its best
efforts to continuously, diligently and competitively design,
sell, advertise, promote, distribute, inventory, and supply each
of the Licensed Articles."  Compl. Ex. A art. VIII; Trial Tr.
vol. 1, 159:6–163:4.

49.  However, defendants did not seek any legal advice in
connection with the development or sale of Original Collection

artwork and stencils. Trial Tr. vol. 1, 160:6–16 (Knapp Test.);
Trial Tr. vol. 2, 282:8–283:1 (Knapp Test.).

50. Instead, Knapp testified that he relied on a
conversation he had with DuFresne prior to the signing of the
Agreement in which they discussed that "it was the unique
colorization" of plaintiff's tattoo designs "that made his
artwork copyrightable." Trial Tr. vol. 2, 282:12–20 (Knapp
Test.). Although DuFresne acknowledged in his testimony that he
had previously discussed his method of coloration with Knapp,
DuFresne flatly denied that they ever discussed what was
copyrightable about his tattoo designs, or the subject of
copyright, at all. Id. 283:16–284:10 (DuFresne Test.). The
Court credits DuFresne's characterization of the nature of their
discussion, rather than Knapp's characterization.

51. TAT began offering Original Collection stencils and
banners depicting Original Collection artwork for sale on its
website during 2008, first only to its affiliates, then to
affiliates and its "Most Valuable Partners" ("MVP"), and
ultimately to the general public. Trial Tr. vol. 2, 258:12–
261:19 (Wolfe Test.) & 267:7–268:24; see also Pl.'s Ex. 15.

52. Plaintiff's copyright information was conspicuously
absent from the Original Collection artwork. Trial Tr. vol. 1,
26:6–9 (DuFresne Test.), 151:19–152:5 (Knapp Test.) & 183:7–7
(Kelly Knapp Dep. Test.).

## H. DuFresne Contacts Defendants about Their Breaches

53. DuFresne accessed TAT's website in early February 2009, and saw that TAT was still displaying the images of plaintiff's copyrighted tattoo designs and offering stencils derived from the Property for sale. Id. 25:9–14 (DuFresne Test.).

54. DuFresne contacted defendants by telephone on February 9, 2009 to inquire about TAT's failure, since January 2007, to provide plaintiff statements of Gross Sales and royalty payments. Trial Tr. vol. 1, 24:11–21 (DuFresne Test.), 63:22–64:2, 66:14–21 & 74:23–75:5.

55. Knapp claimed in that telephone conversation that he believed, based on the bankruptcy notice, that plaintiff was bankrupt, which DuFresne denied. Id. 24:22–25:2 (DuFresne Test.); 58:15–18, 62:7–64:2, 66:14–67:20.

56. Knapp then told DuFresne that "within a week he'd have [DuFresne] a report and royalties." Id. 25:3–4 (DuFresne Test.), 66:21–23 & 67:19–20.

57. However, Knapp provided no such report or royalty payment and, indeed, never communicated with plaintiff again until plaintiff instituted litigation against defendants. Id. 25:5–8 (DuFresne Test.).

## I.    Plaintiff Terminates the Agreement

58.    Three or four weeks after the aforementioned telephone conversations, DuFresne again accessed TAT's website, and discovered that the images of plaintiff's copyrighted tattoo designs had been removed from the website and replaced with the Original Collection artwork.    Id. 25:15–26:5 (DuFresne Test.), 73:18–74:10 & 78:18–24; cf. Trial Tr. vol. 2, 211:21–213:18 (Wolfe Test.) (Wolfe testifying that, to his recollection, plaintiff's copyrighted tattoo designs were taken down in May 2009, around the time the termination letter was received).

59.    On May 14, 2009, at plaintiff's direction, plaintiff's counsel sent TAT a letter immediately terminating the Agreement based on TAT's "failure to pay the minimum royalties and/or report royalties" (the "termination letter").    Tr. Ex. 42; see also Trial Tr. vol. 1, 26:13–15 (DuFresne Test.).    The termination letter directed TAT to "return any artwork in [TAT's] possession, custody or control pertaining to or owned by Tattoo Art, Inc., along with a complete accounting of all sales" to date.    Tr. Ex. 42.    The termination letter further notified defendants "to immediately cease and desist any further use of artwork owned by Tattoo Art, Inc.," warning defendants that such use "will be considered copyright infringement, subject to penalties and damages as provided by law."    Id.

60. By letter to defendants' internet service provider ("ISP") dated May 29, 2009, plaintiff's counsel instructed defendants' ISP to take down the pages on defendants' website that displayed Original Collection images. Tr. Ex. 43; see also Trial Tr. vol. 1, 27:1–6 (DuFresne Test.).

## J. TAT's Actions after Receiving the Termination Letter

61. Despite defendants' receipt of the termination letter, see id. 153:7–12 (Knapp Test.), they did not return plaintiff's artwork, provide a complete accounting of Gross Sales, or provide any of the royalty payments due to plaintiff pursuant to the Agreement in response to the termination letter.

62. Defendants also did not remove or otherwise render inaccessible the pages on TAT's website displaying Original Collection artwork. Instead, defendants actually made additional pages of Original Collection artwork on TAT's website accessible to the general public, and continued selling stencils derived from plaintiff's Property. Trial Tr. vol. 1, 26:16–25 (DuFresne Test.) & 27:7–23; Trial Tr. vol. 2, 261:20–264:1 (Wolfe Test.).

63. Defendants did not attempt to render the pages of TAT's website displaying the Original Collection artwork inaccessible to the public until July 2009, within weeks after plaintiff filed its initial lawsuit against defendants. Trial

Tr. vol. 1, 77:6–78:24 (DuFresne Test.); see also Trial Tr. vol. 2, 213:23–215:1 (Wolfe Test.).

64. Defendants subsequently discovered that their initial attempt to render the Original Collection artwork—and possibly plaintiff's original copyrighted tattoo designs—inaccessible was unsuccessful, because the images could still be accessed by means of the search function on TAT's website. Trial Tr. vol. 2, 215:2–216:22 (Wolfe Test.). Defendants thereafter corrected the oversight, rendering the pages containing the images entirely inaccessible to the public. Id. 216:24-217:24 (Wolfe Test.). However, defendants did not actually remove the pages containing the images from the website; they simply restricted access to them. Id. 264:2–5 (Wolfe Test.).

65. Defendants' website, even as of the date of trial, still contained references to "J.D. Crowe" and plaintiff's copyrighted tattoo designs, suggesting that TAT's MVPs have access to those designs on a cloaked website. Pl.'s Ex. 14. Defendants claim that such references are erroneous, and that no one could actually access those designs as of the date of trial. Trial Tr. vol. 2, 264:6–265:8 (Wolfe Test.), 270:10–25.

66. By letter dated July 29, 2009, defendants' counsel represented to plaintiff that defendants were "willing to promptly return all artwork, and provide a complete accounting

of all sales under the License Agreement, up to May 14, 2009."
Tr. Ex. 46; Trial Tr. vol. 1, 33:9–13 (DuFresne Test.).

67. However, defendants did not return plaintiff's copyrighted artwork, and the accounting they provided on August 5, 2009 proved to be inaccurate. Trial Tr. vol. 1, 33:18–34:15 (DuFresne Test.); Tr. Ex. 47.

68. Defendants continued selling stencils derived from plaintiff's Property, albeit allegedly inadvertently, during the pendency of plaintiff's initial lawsuit, the mediation, and even during the pendency of the instant matter. Id. 174:23–175:3 (Knapp Test.); Trial Tr. vol. 2, 232:6–233:24 (Wolfe Test.) (estimating gross revenue of "around $4,500" from all Licensed Article and Original Collection sales made after May 14, 2009, including approximately $500 in sales during August 2009).

69. Defendants provided plaintiff with multiple accountings of Gross Sales, each of which was found to have omitted sales of Licensed Articles. Trial Tr. vol. 1, 34:19–39:5 (DuFresne Test.). Over the course of these accountings, the claimed amount of sales of Licensed Articles for which royalties were due nearly tripled in comparison with the amount claimed in TAT's initial accounting. Id. 38:11–39:5 (DuFresne Test.).

### K. TAT's Gross Revenues, Profits, and Expenses

70. TAT's gross revenues for 2006 were $1,425,370. Trial Tr. vol. 1, 175:4—25 (Knapp Test.).

71. TAT's gross revenues for 2007 were $1,278,421. Id. 176:1—2 (Knapp Test.).

72. TAT's gross revenues for 2008 were $1,474,839. Id. 176:3—4 (Knapp Test.).

73. TAT's gross revenues for 2009 were $865,232. Id. 176:5—6 (Knapp Test.).

74. TAT's profits from 2006 through 2008 totaled approximately $1,876,000. Id. 188:15—18 (Wolfe Dep. Test.).

75. Defendants described the business derived from TAT's contractual relationship with plaintiff from 2006 through 2009 as being "very small bordering on insignificant," Trial Tr. vol. 2, 208:2—11 (Wolfe Test.), constituting "a very small component" of TAT's total product offering, id. 207:10—13 (Wolfe Test.), and constituting only "about one half of one percent of [defendants'] overall sales." Id. 275:23—25 (Knapp Test.); see generally id. 206:19—210:16 (Wolfe Test.).

76. However, defendants made "no attempt to determine" the portion of total sales attributable to plaintiff's Property beyond preparation of TAT's profit and loss statement. Id. 257:11—258:11 (Wolfe Test.).

77. Defendants indicated that the Original Collection was developed "at considerable expense," taking "over a year to complete and cost[ing] [defendants] about $27,500." Trial Tr. vol. 1, 153:15—23 (Knapp Test.).

### III. CONCLUSIONS OF LAW

#### A.    Jurisdiction and Venue

Subject-matter jurisdiction in this matter is properly based on the existence of both a "federal question" pursuant to 28 U.S.C. § 1338, the statute conferring exclusive jurisdiction upon the federal courts in copyright infringement suits, and complete diversity of citizenship among the parties pursuant to 28 U.S.C. § 1332.

Section 411(a) of the Copyright Act provides in relevant part that "no civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title." 17 U.S.C. § 411(a). Although the United States Court of Appeals for the Fourth Circuit historically interpreted this statute to mean that "[c]opyright registration is a jurisdictional prerequisite to bringing an action for infringement under the Copyright Act," the United States Supreme Court has recently decided to the contrary. See Xoom, Inc. v. Imageline, Inc., 323 F.3d 279, 285 (4th Cir.), cert. denied, 540 U.S. 879 (2003), abrogated on other grounds by

<u>Reed Elsevier, Inc. v. Muchnick</u>, 130 S. Ct. 1237, 1241 (2010)
("Section 411(a)'s registration requirement is a precondition to filing a claim that does not restrict a federal court's subject-matter jurisdiction."). Consequently, this Court properly has subject-matter jurisdiction over plaintiff's copyright infringement claims for both its registered and unregistered images. The parties have further stipulated that this Court has personal jurisdiction over them, and that venue is proper in this District. <u>See</u> Compl. Ex. A art. XIII & Docket No. 42 at 1.

## B. Plaintiff's Copyright Infringement Claim

This Court determined in its February 28, 2011 Opinion and Order that defendants' development and marketing of the Original Collection—i.e., their recolored images derived from, at a minimum, the silhouettes of plaintiff's copyrighted tattoo designs—was beyond the scope of the license granted by the Agreement, and therefore constituted copyright infringement, both before and after defendant received the termination letter. Docket No. 48 at 14–15. There remain, however, substantive issues that affect the measure and exact calculation of damages for defendants' infringement. The Court will address each such issue in turn.

## 1. The Measure of Damages for Copyright Infringement

The Copyright Act of 1976, codified as amended in Title 17 of the United States Code, provides in relevant part that "an

infringer of copyright is liable for either . . . the copyright owner's actual damages and any additional profits of the infringer . . . or . . . statutory damages." 17 U.S.C. § 504(a). Plaintiff has included in its proposed findings of fact and conclusions of law calculations for statutory damages with respect to its registered images and actual damages for its unregistered images, and on the basis of those calculations, requests an award of statutory damages in the amount of $2,000,000.00.

The statutory damages provision of the Copyright Act, 17 U.S.C. § 504(c)(1), provides:

> [T]he copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally, in a sum of not less than $750 or more than $30,000 as the court considers just.

17 U.S.C. § 504(c)(1). The foregoing range of statutory damages is, however, subject to two relevant statutory caveats:

> In a case where the copyright owner sustains the burden of proving, and the court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000. In a case where the infringer sustains the burden of proving, and the court finds, that such infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court in its discretion may reduce the award of statutory damages to a sum of not less than $200.

17 U.S.C. § 504(c)(2).

In calculating statutory damages, 17 U.S.C. § 504(c)(1) further provides that "all the parts of a compilation or derivative work constitute one work." 17 U.S.C. § 504(c)(1). "Compilation" is defined statutorily as "a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship. The term "compilation" includes "collective works." 17 U.S.C. § 101. A "collective work," in turn, is statutorily defined as "a work, such as a periodical issue, anthology, or encyclopedia, in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole." Id.

A "derivative work" is statutorily defined as:

a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work".

Id.

30

## 2. The Court's Calculation of Statutory Damages

### a. Willful or Unwitting Infringement

This Court indicated in its February 28, 2011 Opinion and Order that "whether or not defendants' infringement was committed willfully is not a question of liability, but instead a matter of statutory damages pursuant to 17 U.S.C. § 504." Docket No. 48 at 15. (citing Lyons P'ship, L.P. v. Morris Costumes, Inc., 243 F.3d 789, 799-800 (4th Cir. 2001)). As the Fourth Circuit explained in Lyons, infringement has been held to be willful for purposes of enhanced statutory damages when a defendant acted with actual or constructive knowledge that his actions constituted infringement or recklessly disregarded a copyright holder's rights. Lyons, 243 F.3d at 799.

This Court has reviewed, and painstakingly weighed, the totality of the evidence before it in this connection. Plaintiff's evidence at trial cast defendants' actions, quite appropriately, in an extremely unfavorable light, and defendants' actions vis-à-vis plaintiff in this matter are far from the innocent or unwitting end of the spectrum. Thus, reduced statutory damages would be inappropriate in this matter. However, neither can this Court conclude, with an amount of confidence sufficient to justify enhanced statutory damages, that defendants willfully infringed plaintiff's copyrights.

### i. Plaintiff's Claimed Business Justification

The business justification defendants offered for their development and marketing of the Original Collection artwork and stencils was certainly a plausible one. It may well have been the case that the original coloration of plaintiff's ink artwork was, in many cases, too intricate for the airbrush medium, thus rendering that artwork ineffective in marketing the stencils, because many airbrush artists would be incapable of creating an airbrush tattoo with the stencil that would actually resemble plaintiff's artwork. However, any potential legitimacy that such a business justification might have had was entirely overshadowed by the illegitimacy of the circumstances in which the Original Collection was developed. The very name chosen by defendants for their derivative artwork—the Original Collection—is particularly telling in this connection. Defendants developed the Original Collection long after they had stopped providing plaintiff with the statements of Gross Sales and royalty payments required by the Agreement. Defendants never contacted plaintiff, or consulted an attorney, regarding the development or marketing of the Original Collection. Defendants never paid plaintiff any royalties on Original Collection sales prior to the instant litigation—not when DuFresne contacted them by telephone, and not even when they received the termination letter. Indeed, it was not until plaintiff actually sued

defendants that defendants offered to make good on TAT's obligations under the Agreement, and the accounting that defendants initially provided to plaintiff proved to be woefully inaccurate.

### ii. The Bankruptcy Notice Excuse

In the same vein, even if the Court had believed defendants' excuse premised on their receipt of the bankruptcy notice, such an explanation would only serve to reinforce the highly questionable nature of defendants' actions. Defendants offered the Court no legal support for the proposition that, even if they had received a bankruptcy notice that actually related to plaintiff or DuFresne, as opposed to an uninvolved third party, such receipt would have justified or required defendants to cease fulfilling their contractual obligations to plaintiff pursuant to the Agreement. Instead, one could easily conclude—though the Court need not do so here—that defendants opportunistically took advantage of what they believed to be plaintiff's bankruptcy to appropriate his copyrighted artwork for their own continued use and profit, without any regard to the continued validity of the Agreement between them.

### iii. The Agreement's "Best Efforts" Clause

Tipping the scales slightly in the other direction is defendants' claimed reliance on TAT's obligation to use "its best efforts to continuously, diligently and competitively

design . . . the Licensed Articles" under Article VIII of the Agreement. Compl. Ex. A art. VIII. Although this Court determined in its February 28, 2011 Opinion and Order that Article VIII, as a matter of law, could not reasonably be interpreted as authorizing defendants' development of the Original Collection, see Docket No. 48 at 13–14, it is not entirely inconceivable that defendants actually believed, and relied on, this legally flawed interpretation. Of course, such an interpretation would have been considerably more plausible had it not arisen in a context in which TAT had already long since defaulted on many of its other obligations under the Agreement, most notably the obligation to pay plaintiff royalties. Moreover, defendants certainly should not be rewarded for their failure to consult plaintiff or seek legal counsel about the permissibility of their Original Collection project. Nevertheless, the Court cannot rule out the possibility that defendants, in developing the Original Collection, were motivated, at least in part, by TAT's obligation to use its best efforts to design the Licensed Articles.[4]

---

[4] This Court explained in its February 28, 2011 Opinion and Order that TAT's authority to "design" contemplated by Article VIII of the Agreement "would extend to, for example, the material out of which the stencils [i.e., the Licensed Articles] were constructed, and not to the coloring of plaintiff's copyrighted designs themselves." Docket No. 48 at 14.

34

### iv. Insufficient Evidence to Establish Willfulness

On the basis of the foregoing observations, the Court finds there to be insufficient evidence in the record before it to establish affirmatively that defendants had actual or constructive knowledge that their actions constituted infringement. However ill-advised the development of the Original Collection has proven in hindsight, the Court cannot conclude definitively that such development was consciously undertaken with knowledge, actual or constructive, that it would constitute infringement.

In the same vein, although defendants' actions in this matter could easily be characterized as recklessly disregarding TAT's contractual obligations to plaintiff under the Agreement, the Court cannot conclude that such actions were undertaken in reckless disregard of plaintiff's copyrights. In this connection, the Court notes that the development of the Original Collection occurred in the context of a licensor-licensee relationship, albeit one that had already been breached in other respects by defendants. Defendants were not complete strangers to plaintiff who appropriated and re-sold DuFresne's artwork entirely unbeknownst to him. Instead, defendants had a contractual relationship with plaintiff, pursuant to which plaintiff provided them with, and authorized their use of, DuFresne's copyrighted tattoo designs.

Defendants' defaults under the Agreement, though numerous, do not by themselves necessarily establish the requisite reckless disregard of plaintiff's copyrights. Consequently, finding that defendants' actions were neither willful nor innocent, the Court shall award damages within the standard range "of not less than $750 or more than $30,000 as the court considers just." 17 U.S.C. § 504(c)(1). The next question, of course, is how many separate works of plaintiff were infringed by defendants.

### b.    The Number of Works Infringed

Plaintiff claims that "[t]he Defendants infringed upon a total of 708 Works which were subject to a claim of copyright by Tattoo Art," of which "212 individual Works . . . were registered with the U.S. Copyright Office." Id. at 17–18; see also Tr. Exs. 1, 80. Plaintiff "has elected to receive statutory damages for the 212 registered Works." Docket No. 59 at 23. Plaintiff contends that it should receive an award of statutory damages for each such registered image infringed upon by defendants because "[e]ach of the individual images has independent economic value and is sold separately," and the images were "not registered as compilations or derivative works." Docket No. 59 at 17.

Defendants argue in response that plaintiff's Books constitute "collective works" as that term is defined in 17

U.S.C. § 101, and that since the Property was drawn from 16 of plaintiff's Books, plaintiff is only entitled to 16 statutory damages awards, one per sheet from each such Book.

"The question of whether a work constitutes a 'compilation' for purposes of statutory damages pursuant to Section 504(c)(1) of the Copyright Act is a mixed question of law and fact." Bryant v. Media Right Prods., Inc., 603 F.3d 135, 140 (2d Cir.) (citing Gamma Audio & Video, Inc. v. Ean-Chea, 11 F.3d 1106, 1116 (1st Cir. 1993)), cert. denied, 131 S. Ct. 656 (2010). The United States Courts of Appeals have employed divergent modes of analysis in determining what constitutes a "compilation" and/or "one work" for purposes of statutory damages.

### i.    The "Independent Economic Value" Test

The United States Court of Appeals for the First Circuit, for example, has historically looked in this connection to applicable "regulations promulgated by the [United States] Copyright Office," which provide that "the copyrights in multiple works may be registered on a single form, and thus considered one work for the purposes of registration while still qualifying as separate "works" for purposes of awarding statutory damages." Gamma Audio & Video, Inc. v. Ean-Chea, 11 F.3d 1106, 1117 (1st Cir. 1993) (citing 37 C.F.R. § 202.3(b)(3)[(i)](A). That regulation, which is now codified at 37 C.F.R. § 202.3(b)(4)(i), provides in relevant part:

37

> For the purpose of registration [of copyright] on a
> single application and upon payment of a single
> registration fee, the following shall be considered a
> single work:  (A) In the case of published works: all
> copyrightable elements that are otherwise recognizable
> as self-contained works, that are included in a single
> unit of publication, and in which the copyright
> claimant is the same.

37 C.F.R. § 202.3(b)(4)(i).  Relying on this language, the First Circuit in Gamma applied a "functional test . . . with the focus on whether each expression . . . has an independent economic value and is, in itself, viable."  Id.

### ii.  The Alternative Plain-Language Test

Although several other United States Courts of Appeals have also adopted this "independent economic value" test, the United States Court of Appeals for the Second Circuit declined to adopt that test in a recent published opinion.  See Bryant, 603 F.3d at 140–42 (2d Cir.) (discussing its own prior decisions as well as Gamma and similar published decisions from the Ninth, Eleventh, and D.C. Circuits), cert. denied, 131 S. Ct. 656 (2010).  In Bryant, the Second Circuit emphasized that the Copyright "Act specifically states that all parts of a compilation must be treated as one work for the purpose of calculating statutory damages.  This language provides no exception for a part of a compilation that has independent economic value, and the Court will not create such an exception."  Id. at 142.

In rejecting the "independent economic value" test in Bryant, the Second Circuit distinguished its prior decision in Robert Stigwood Group, Ltd. v. O'Reilly, 530 F.2d 1096, 1105 (2d Cir. 1976). In Stigwood, the Second Circuit had "held that each separately copyrighted song from the musical Jesus Christ Superstar could be the subject of a separate statutory award because each song could 'live [its] own copyright life.'" Bryant, 603 F.3d at 142 n.7 (quoting Stigwood, 530 F.2d at 1104–05) (alteration in original). The Second Circuit explained that, in Stigwood, it had been "awarding statutory damages pursuant to the Copyright Act of 1909, which provided for a separate statutory damage award 'for each infringement that was separate,'" and not under the Copyright Act of 1976, in which "[t]he one-award restriction for compilations was introduced." Id.

Bryant also reviewed other, more recent Second Circuit decisions on the contours of a "compilation," emphasizing that the court had historically "focused on whether the plaintiff—the copyright holder—issued its works separately, or together as a unit," and explaining that, in those cases, the plaintiffs had issued their infringed works separately, and it was the defendants who had combined those works into the infringing compilation. Id. at 141. By contrast, the plaintiffs in Bryant chose to issue their songs as albums instead of individually.

The Second Circuit held that "[i]n this situation, the plain language of the Copyright Act limits the copyright holders' statutory damage award to one for each Album." Id.

### iii. Fourth Circuit Position

The Fourth Circuit's decision in Xoom appears to side with the Second Circuit's approach in Bryant. See Xoom, 323 F.3d at 285. Indeed, it is among the cases cited by the Second Circuit in Bryant in support of its "one-award" holding. See Bryant, 603 F.3d at 141 n.6. Although plaintiff correctly cites Xoom for the proposition that the determination of the number of "works" eligible for separate statutory damages awards is not determined by the number of registrations, see Xoom, 323 F.3d at 285 n.8, Xoom does not categorically support plaintiff's position that it may recover statutory damages for each individual infringed image on each sheet of tattoo flash.

In Xoom, the defendant/counterclaim plaintiff alleged infringement of its copyrighted collections of computer clip-art images, "premis[ing] its damages claim on a per-image, per-infringement calculation," despite the fact that such images were not registered individually, but instead collectively as part of two separate compilations named "PicturePak SuperBundle" and "Imageline Master Gallery". XOOM, Inc. v. Imageline, Inc., 93 F. Supp. 2d 688, 691 (E.D. Va. 1999), aff'd in part & rev'd in part by Xoom, Inc., 323 F.3d at 279. The district court

rejected the counterclaim plaintiff's position, concluding instead after a brief analysis that a literal application of 17 U.S.C. § 504 dictated "that there should be only one award of statutory damages per registration regardless of the number of infringements or the number of products containing infringing images." Id. at 693 (citing Walt Disney Co. v. Powell, 897 F.2d 565, 569–70 (D.C. Cir. 1990)).

On appeal, the Fourth Circuit affirmed in part and reversed in part the district court's decision. The Fourth Circuit "decline[d] to make a determination of whether the individual clip-art images were effectively registered through the registrations of SuperBundle and Master Gallery." Id. at 283. Instead, the Fourth Circuit simply found "that Imageline's registration of SuperBundle and Master Gallery was sufficient to provide copyright protection to the underlying preexisting works of each," noting that Imageline had "created SuperBundle and Master Gallery, both compilations or derivative works, and the underlying works which those products encompassed." Id.

Turning to the separate question of the number of works for which statutory damages could be awarded, the Fourth Circuit found that the district court had "incorrectly held that 'there should be only one award of statutory damages per registration regardless of the number of infringements or the number of products containing infringing images.'" Id. at 285 n.8

41

(quoting XOOM, 93 F. Supp. 2d at 693). The Fourth Circuit instead explained that "Imageline is entitled to one award of statutory damages per work infringed because SuperBundle and Master Gallery are compilations or derivative works in which Imageline holds copyrights, not because they are single registrations." Id.; see also Bryant, 603 F.3d at 141 ("The fact that each song may have received a separate copyright is irrelevant to this analysis."). Although the Fourth Circuit concluded that "Imageline's registration of SuperBundle and Master Gallery covered, for purposes of [that] action, the products in their entirety and the underlying preexisting works contained therein in which Imageline also owned copyright," since "both SuperBundle and Master Gallery can be classified as either compilations or derivative works," the court concluded "that, for purposes of determining statutory damages under Section 504(c)(1), the registrations of SuperBundle and Master Gallery constitute a total of two works (one for each registration of the compilation or derivative work)" and "[t]herefore, Imageline may only receive a maximum of two awards of statutory damages for copyright infringement." Id. at 285.

The Fourth Circuit's analysis in Xoom is largely consistent with the Second Circuit's analysis in Bryant. There, the plaintiffs had registered not only their albums, but also certain individual songs, and the Second Circuit assumed for

purposes of its decision that "each song on the Albums was copyrighted separately." 603 F.3d at 138 & 140 n.4. As noted above, however, the Second Circuit indicated that "[t]he fact that each song may have received a separate copyright is irrelevant to [the] analysis" of whether an album is a compilation justifying only a single statutory damage award. Id. at 141.

### iv. Application of Bryant and Xoom to the Instant Matter

The foregoing analysis suggests that neither the precise method by which the copyright holder registers his work nor the existence of separate copyrights for each constituent element of a copyrighted work is dispositive of the work's status as a "compilation" for purposes of statutory damages. Instead, as the Second Circuit explained in Bryant:

> An album is a collection of preexisting materials—
> songs—that are selected and arranged by the author in
> a way that results in an original work of authorship—
> the album. Based on a plain reading of the statute,
> therefore, infringement of an album should result in
> only one statutory damage award.

603 F.3d at 140—41.

As detailed above in the Court's findings of fact, DuFresne sought to emphasize in his testimony at trial the arbitrary, even "random," manner in which he organized his tattoo flash sheets for copyright registration and sale. Although it was implicit in DuFresne's testimony that he created the various

43

tattoo flash sheets comprising each Book at different times, see Trial Tr. vol. 1, 51:24–52:4 (DuFresne Test.), it does not appear from that testimony that he issued those sheets in any economically meaningful way—i.e., for sale or licensing—on a separate, sheet-by-sheet or image-by-image basis. Although, as previously noted, DuFresne indicated that he sometimes sells individual images, he also testified that the sheets "were put together for sale and done in 50 sheets to just help with the cost of a copyright compared to 50 copyrights." Id. 51:10–12 (DuFresne Test.); cf. Twin Peaks Productions, Inc. v. Publ'ns Int'l, Ltd., 996 F.2d 1366, 1381 (2d Cir. 1993); WB Music Corp. v. RTV Commc'n Grp., Inc., 445 F.3d 538, 541 (2d Cir. 2006). Although plaintiff's manner of organizing the Books for purposes of copyright registration is not dispositive, the fact that such organization was also adopted for purposes of the sale of plaintiff's tattoo images leads the Court to conclude, pursuant to Xoom and Bryant, that plaintiff is only entitled to one statutory damage award per Book infringed. As the Court noted above in its Findings of Fact, 212 of the 711 images contained in the Property attached to the Agreement were drawn from 24 of plaintiff's registered Books. See Docket No. 42 at 1; Pl.'s Ex. 1; Tr. Exs. 1–24. Consequently, plaintiff is entitled to twenty-four separate statutory damage awards.

44

The Court must also determine the amount of each such statutory damage award. As noted above, since the Court has declined to find defendants' conduct in this matter to have been willful or innocent, the Court may impose damages in any amount from $750 to $30,000 per infringement, as it considers just. In this connection, the Court takes into consideration its observation above that defendants' conduct falls closer to the willful end of the spectrum than the innocent end. The Court also notes that, had it concluded that the "independent economic value" test applied in this Circuit, defendants would have faced hundreds of separate statutory damage awards. In light of the foregoing analysis, the Court considers a statutory damages award in the amount of $20,000 per infringement—much closer to the upper limit of $30,000 than the lower limit of $750—is just and appropriate in this matter, and will consequently award statutory damages in the total amount of $480,000.

### 3. Plaintiff's References to Actual Damages

Although plaintiff's proposed findings of fact and conclusions of law only seek <u>recovery</u> of statutory damages, such pleading also references <u>entitlement</u> to actual damages for infringement of plaintiff's unregistered designs. The Court therefore feels compelled to address plaintiff's claim of entitlement to actual damages. As noted above, in light of the Supreme Court's recent decision in <u>Muchnick</u>, this Court does not

lack subject-matter jurisdiction over plaintiff's copyright claim against defendants for their infringement of both its registered and unregistered tattoo designs. However, the existence of subject-matter jurisdiction does not, by itself, suffice to establish plaintiff's entitlement to a recovery of monetary damages in connection with its unregistered designs at this juncture. As noted above, 17 U.S.C. § 411(a) provides in relevant part that "no civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title." 17 U.S.C. § 411(a). Although the Supreme Court found such language not to be jurisdictional in nature, it expressly "decline[d] to address whether § 411(a)'s registration requirement is a mandatory precondition to suit that . . . district courts may or should enforce <u>sua sponte</u> by dismissing copyright infringement claims involving unregistered works." <u>Muchnick</u>, 130 S. Ct. at 1249.

It appears that the Fourth Circuit has not yet addressed this issue in the wake of the Supreme Court's recent decision in <u>Muchnick</u>. However, several other district courts within the Fourth Circuit have applied <u>Muchnick</u> in analyzing copyright infringement claims relating to unregistered works and, where appropriate, have dismissed such claims. <u>See, e.g.</u>, <u>Ferguson v. Mabry</u>, C/A No. 3:10-2641-CMC-JRM, 2010 WL 5349863, at *1 (D.S.C.

Dec. 21, 2010) (noting that although "prior registration (or, for that matter, contemporaneous notice) is not required to seek relief for alleged infringement," registration "remain[s] as a prerequisite to suit"); Edgerton v. UPI Holdings, Inc., Civ. Action No. CCB-09-1825, 2010 WL 2651304, at *3–7 (D. Md. July 1, 2010) ("Although copyright in an original work exists from the moment of creation, the author must comply with the statutory requirements of the Copyright Act to bring a suit for infringement."); Staggs v. West, Civ. No. PJM 08-0728, 2010 WL 2670979, at *2–3 (D. Md. June 25, 2010) ("while the bar to a federal court's ability to hear such infringement claims is not jurisdictional, the Supreme Court nevertheless has acknowledged [in Muchnick] that § 411(a) imposes the statutory precondition that a copyright must be registered before the copyright infringement claim is filed").

To date, plaintiff has offered the Court no proof of its registration, preregistration, or even application for registration of any of the nearly 500 tattoo designs contained in the Property that were not drawn from one of plaintiff's various registered Books. It is not enough, under applicable law, that defendants have stipulated to plaintiff's copyright interest in both the registered and unregistered designs. In the absence of such proof, plaintiff may not maintain a claim for actual damages with respect to the unregistered designs, the

proof of defendants' infringement of such designs notwithstanding, and the Court cannot agree that plaintiff is entitled to an award of actual damages for such infringement, notwithstanding its disclaimer that it seeks no recovery stemming from such entitlement.

Neither 17 U.S.C. § 411(a) nor the unregistered nature of many of the tattoo designs contained in the Property was ever raised by any party in this matter prior to trial. Moreover, plaintiff's original and amended complaints make no reference to § 411(a)'s registration requirement. However, both complaints make reference to "the more than 640 registered images that are the subject of this action," Docket No. 49 ¶ 15 (emphasis added), an allegation that is factually incorrect. Plaintiff's proposed findings of fact and conclusions of law also fail to acknowledge § 411(a)'s procedural bar, instead curiously claiming that "[u]nlike statutory damages, the Copyright Act does not require a copyright owner to register its copyright as a prerequisite to recovering actual damages or profits." Docket No. 59 at 32. This claim by plaintiff is particularly confusing because the very case that plaintiff cites for it, Olan Mills, Inc. v. Linn Photo Co., 23 F.3d 1345, 1349 (8th Cir. 1994), acknowledges—on the very same page cited by plaintiff, and a mere two sentences away from the sentence quoted by plaintiff—that "registration is required under section 411 of the

Copyright Act in order to bring a suit for infringement." 23 F.3d at 1349.

Plaintiff's counsel took the position during the June 17, 2011 telephonic status conference that the applicability of § 411(a) constituted an affirmative defense that had to be raised by defendants. Defendants' counsel denied that they were required to raise § 411(a) as an affirmative defense, noting that both pre- and post-<u>Muchnick</u> decisions by various courts have considered proof of registration or preregistration to be an element that must be proven by a <u>plaintiff</u> in order to prevail on a copyright infringement claim. While this might seem like an academic point, since plaintiff's ultimate request for monetary relief is limited to statutory damages, the Court again feels compelled to address the issue because plaintiff seemingly seeks to parlay an entitlement to actual damages into a larger statutory damages award. Therefore, the Court notes that, on the basis of its discussion of relevant case law above, it agrees with defendants' position in this regard.

Plaintiff's counsel further took the position during the June 17, 2011 status conference that plaintiff was not, in fact, requesting any award of damages for the unregistered images infringed by defendants. Docket No. 74 at 1–2. Although plaintiff's counsel correctly pointed out during that status conference that the request for damages at the end of

49

plaintiff's proposed findings of fact and conclusions of law characterized the damages requested for defendant's copyright infringement as "amount[ing] to less than $10,000.00 for each of the 212 infringed registered works, without factoring in any compensation for the 496 infringed unregistered works," Docket No. 59 at 34, the position articulated in that portion of the document is confusing in light of the prior references discussed above, as well as additional references in plaintiff's proposed findings of fact and conclusions of law.

For example, plaintiff's counsel expressly proposed elsewhere in that document that the Court adopt the legal conclusion that "Tattoo Art is entitled to recover TAT's profits attributable to the remaining approximately 500 non-registered Works." Id. at 23 ¶ 47. Plaintiff's counsel further proposed that the Court adopt a detailed—and highly speculative—actual damages calculation for plaintiff's unregistered designs, which was premised on the notion that, in the absence of any proof by defendants of TAT's expenses or profits attributable to products other than plaintiff's designs, plaintiff is entitled to substantially all of TAT's profits from 2006 through 2009. Id. at 23-24 ¶¶ 43-53; see also id. at 21 ¶¶ 26-27, 31-32. Plaintiff's counsel specifically claimed, without any mention of 17 U.S.C. § 411(a), that plaintiff "is entitled to recover TAT's profits reasonably attributable to the non-registered Works in

the amount of $1,918,700.00," and that it "is _entitled to judgment_ against TAT International, LLC and Kirk Knapp, jointly and severally, in the aggregate amount of $3,918,700.00 for profits attributable to non-registered works and statutory damages for registered works." _Id._ at 24 ¶¶ 51, 53 (emphasis added).

These legal conclusions, which plaintiff affirmatively proposed that the Court adopt, are simply inaccurate. Although it is true that a plaintiff may recover actual damages for infringements that _occurred_ prior to registration of the infringed work or works, such a recovery may not be _sought_ by filing a lawsuit, let alone actually _recovered_ in such a lawsuit, until the infringed works are registered or preregistered. 17 U.S.C. § 411(a). In other words, infringement prior to registration still constitutes infringement, and can still merit an _eventual_ recovery, but such recovery cannot be sought in a lawsuit until _after_ registration or preregistration of the infringed works. _Olan Mills_, 23 F.3d at 1349; _see also, e.g.,_ _Cosmetic Ideas, Inc. v. IAC/Interactivecorp_, 606 F.3d 612, 619 (9th Cir.), _cert. denied_, 131 S. Ct. 686 (2010) (post-_Muchnick_ decision). Again, while it is certainly true that plaintiff's ultimate damages request sought $2,000,000 and explained that such award "amount[ed] to less than $10,000.00 for each of the 212 infringed registered

works, without factoring in any compensation for the 496 infringed unregistered works," Docket No. 59 at 34, such request was informed, whether intended or not, by these other assertions. Therefore, the Court feels compelled to clarify that, as indicated above, plaintiff is not entitled to any actual damages for defendants' infringement of plaintiff's unregistered tattoo designs. Furthermore, the Court has not considered any such asserted entitlement to actual damages in its statutory damages award calculations.

### C.    Plaintiff's Breach of Contract Claim

### 1.    The Nature of Defendants' Breaches of the Agreement

Turning to plaintiff's breach of contract claim, this Court previously noted in its February 28, 2011 Opinion and Order that defendants do not dispute that TAT breached its obligations under paragraph 3.03 of the Agreement by failing to provide plaintiff with the requisite statements of Gross Sales and corresponding royalty payments starting in January 2007. Docket No. 48 at 22. The testimony offered at trial was consistent with that concession. Moreover, the Court's findings of fact above establish several additional ways in which TAT breached its obligations under the Agreement:

- TAT's statements of Gross Sales and corresponding royalty payments for the first three Calendar Quarters of 2006 were inaccurate to the detriment of plaintiff, thus breaching TAT's obligations under paragraph 3.03 of the Agreement.

52

- TAT breached paragraph 3.04 of the Agreement by failing, during the entire term of the Agreement, to pay the minimum royalties required by it.

- The consistently inaccurate nature of TAT's successive accountings prepared in connection with the instant litigation clearly demonstrate that TAT breached paragraph 5.01 of the Agreement, which required TAT to maintain accurate books and records relating to the Licensed Articles.

- The testimony at trial also established that TAT breached paragraph 5.01 by failing to designate—or, at least, to use consistently—exclusive symbols or numbers in its books and records for plaintiff's designs that would "facilitate the examination of [TAT]'s books and records with respect to any amount due." Compl. Ex. A ¶ 5.01; see Trial Tr. vol 1, 103:22–115:9 (VanderWel Dep. Test.); 178:21–182:24 (Kelly Knapp Dep. Test.); Trial Tr. vol. 2, 227:2–228:12 (Wolfe Test.).

- The testimony at trial further established that TAT breached paragraph 11.02 of the Agreement by failing to "apply '© J.D. Crowe 2005' on each sheet containing the Licensed Articles," and affirmatively removing plaintiff's copyright from the Original Collection artwork. Compl. Ex. A ¶ 11.02; Trial Tr. vol. 1, at 173:14–174:4 (Knapp Test.), 183:7–17 (Kelly Knapp Dep. Test.).

- TAT's infringements of plaintiff's copyrights in developing and marketing the Original Collection exceeded the scope of the license granted by the Agreement, and thus constituted additional breaches of the Agreement.

### 2. The Irrelevance of the Bankruptcy Notice

The Court has already concluded above in its findings of fact that defendants' claimed case of mistaken identity with regard to the bankruptcy notice they received could not have been the reason for TAT's failure to provide the statement of Gross Sales and corresponding royalty payment for the fourth Calendar Quarter of 2006. To the extent that defendants claim

that the bankruptcy notice was the reason for withholding subsequent statements of Gross Sales and royalty payments, the Court notes that both defendants' counsel and Knapp have consistently failed to suggest any basis whatsoever for their position that the filing of a bankruptcy petition automatically stays the contractual obligations of the filer's debtors. However, even if defendants' position in that regard were correct, it would not apply in this matter because it was not plaintiff who was bankrupt. Defendants provide no legal authority for their position that mistaking a notice of bankruptcy for an uninvolved third party somehow operated to suspend defendants' obligations to plaintiff under the Agreement in such a way as to prevent such suspension from constituting a breach.

## 3. The Measure of Damages for Breach of the Agreement

This Court previously determined in its February 28, 2011 Opinion and Order that the Agreement is governed by Virginia law, pursuant to the valid, enforceable choice-of-law provision contained therein. Under Virginia law, "'[t]he elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation.'" Sunrise Continuing Care, LLC v. Wright, 671 S.E.2d 132, 136 (Va. 2009)

(quoting Filak v. George, 594 S.E.2d 610, 614 (Va. 2004)). With respect to burden of proof for damages caused by a breach of contract, the plaintiff has "the 'burden of proving with reasonable certainty the amount of damages and the cause from which they resulted; speculation and conjecture cannot form the basis of the recovery.'" SunTrust Bank v. Farrar, 675 S.E.2d 187, 191 (Va. 2009) (quoting Shepherd v. Davis, 574 S.E.2d 514, 524 (Va. 2003)); accord Isle of Wight County v. Nogiec, 704 S.E.2d 83, 85–86 (Va. 2011); Sunrise, 671 S.E.2d at 137 ("When a plaintiff has proved a breach of contract, the burden of proof regarding damages does not then shift to the defendant. The burden of proof remains with the plaintiff to prove with reasonable certainty the measure of damages sustained."). "Damages cannot be recovered if derived from uncertainties, contingencies, or speculation," SunTrust, 675 S.E.2d at 191, and "[t]he failure to establish damages with reasonable certainty warrants the dismissal of a breach of contract claim." Nogiec, 704 S.E.2d at 86.

## 4. The Court's Calculations of Breach of Contract Damages

In the absence of any accurate accounting of TAT's sales of products relating to plaintiff's Property, plaintiff engages in speculative calculations to reach the conclusion that $1,000,000 of TAT's revenues each year were attributable to plaintiff's Property, and that plaintiff is due royalties in the amount of

$437,500.00. See Docket No. 59 at 10—16. The Court will not address in detail the numerous assumptions upon which plaintiff's calculations are based; suffice it to say that such calculations are far too speculative to satisfy plaintiff's burden under Virginia law to prove damages with reasonable certainty. See, e.g., SunTrust, 675 S.E.2d at 191; see also Docket No. 59 at 14 ("Because of TAT's unreliable system of accounting, it is impossible to be exact as to how much revenue should be attributed to Tattoo Art's Works. As such, it is impossible to be exact as to how much TAT owes Tattoo Art in royalty payments."). Although defendants certainly should not be rewarded for maintaining such manifestly inadequate books and records, neither may the Court indulge in speculative calculation. Instead, in light of the amount of sales reflected in defendants' January 2011 accounting, and the Court's aforementioned credibility determination with respect to Mr. Wolfe's good faith efforts in preparing it, the Court believes that the minimum royalties required by the Agreement constitute the appropriate damages award for TAT's various breaches thereof. Thus, the Court will award damages in the amount of $20,250.00 in that connection.

## D. Permanent Injunction

This Court is expressly authorized by statute to "grant temporary and final injunctions on such terms as it may deem

reasonable to prevent or restrain infringement of a copyright."
17 U.S.C. § 502(a).  As the Supreme Court has explained:

> [A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief.  A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006); accord Monsanto Co. v. Geertson Seed Farms, 130 S. Ct. 2743, 2756 (2010) (quoting the above language from eBay); see also Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 129 S. Ct. 365, 374 (2008).

As noted above in the Court's findings of fact, TAT explicitly "acknowledge[d] that its failure . . . to cease the manufacture, sale or distribution of the Licensed Articles upon the termination or expiration of [the] Agreement" would entitle plaintiff to temporary and permanent injunctive relief.  Compl. Ex. A ¶ 7.01.  Although this acknowledgment might well preclude TAT from opposing the award of injunctive relief, it does not, by itself, establish plaintiff's entitlement to such relief. Instead, the Court must still consider the four-factor test set forth in eBay.

## 1. Irreparable Harm and the Adequacy of Remedies at Law

"Irreparable injury often derives from the nature of copyright violations, which deprive the copyright holder of intangible exclusive rights." Christopher Phelps & Assocs., LLC v. Galloway, 492 F.3d 532, 544 (4th Cir. 2007); accord EMI Apr. Music, Inc. v. White, 618 F. Supp. 2d 497, 510 (E.D. Va. 2009); see also Splitfish AG v. Bannco Corp., 727 F. Supp. 2d 461, 467–68 (E.D. Va. 2010). The inquiry for irreparable harm "inevitably overlaps with" the inquiry as to the adequacy of legal remedies. MercExchange, L.L.C. v. eBay, Inc., 500 F. Supp. 2d 556, 582 (E.D. Va. 2007). In light of the Court's findings of fact herein, the Court concludes that:

> allowing defendants to continue to distribute [plaintiff's copyrighted tattoo designs or their derivative Original Collection images]—particularly when the record reflects that plaintiff[] [has] not licensed the [development and marketing of the Original Collection]—would significantly diminish the intangible value of the [Property] to plaintiff[] in a manner that could not be cured by damages alone.

Splitfish, 727 F. Supp. 2d at 467. "Damages at law will not remedy the continuing existence of" defendants' unauthorized derivative Original Collection images. Galloway, 492 F.3d at 544. Thus, it appears that plaintiff has satisfied the first two factors.

## 2. The Balance of Hardships

The Court must next consider whether the balance of hardships between the parties supports granting a permanent injunction against defendants. A permanent injunction in this case would prevent defendants from disposing of their remaining stock of stencils derived from plaintiff's Property or defendants' own derivative Original Collection. The Court obviously recognizes the expense defendants allegedly incurred in developing the Original Collection and either manufacturing in-house or ordering the corresponding stencils. However, the very conception of the Original Collection was without plaintiff's consent and beyond the scope of the license granted by the Agreement. Furthermore, plaintiff in no way encouraged defendants to incur the expenses relating to the Original Collection.

With respect to stencils directly derived from plaintiff's original artwork, defendants had long since stopped paying the required royalties on sales thereof. Moreover, it should be noted that defendants' testimony at trial suggested that plaintiff's original artwork was largely ineffective in selling the stencils.

Consequently, the hardship to defendants resulting from a permanent injunction is relatively minor, and would only cost them expenses that should never have been incurred in the first

place. On the other hand, allowing defendants to continue marketing the unauthorized, derivative Original Collection would constitute a severe hardship to plaintiff, who would then conceivably be forced to compete with products derived from his own copyrighted tattoo designs.

### 3. Public Interest

Finally, plaintiff must also show that the public interest would not be disserved by granting a permanent injunction. "It is easy to understand that the public interest reflected in the constitutional protection of copyright, and the Congressional enactment of the Copyright Act, is enhanced by issuance of a permanent injunction where copyright infringement has taken place." White, 618 F. Supp. 2d at 511. Therefore, it appears that plaintiff has also satisfied the public interest prong of the injunction test.

### 4. The Permissible Scope of the Injunction

As noted above, plaintiff has provided the Court with no proof of registration, preregistration, or even application for registration of the unregistered tattoo designs contained in the Property. Although the Court does not lack subject-matter jurisdiction over plaintiff's claim relating to such unregistered designs, the Court must still determine whether it has the authority to extend any permanent injunction granted herein to encompass both the registered and the unregistered

60

designs. During the June 17, 2011 telephonic status conference, defendants' counsel conceded that it was within this Court's discretion to enjoin defendants' conduct with respect to plaintiff's unregistered tattoo designs. However, this Court must nevertheless examine the applicable case law for itself to determine both the permissibility and appropriateness of ordering such injunctive relief.

The Second Circuit addressed this issue in the decision that was subsequently reversed, on related but distinct grounds, by the Supreme Court in Muchnick. See In re Literary Works in Elec. Databases Copyright Litig., 509 F.3d 116 (2d Cir. 2007), rev'd on other grounds, Muchnick, 130 S. Ct. at 1237. The Second Circuit explained in its decision that several other United States Courts of Appeals "have enjoined the infringement of unregistered copyrights when at least one of the plaintiff's copyrights-in-suit was registered." Id. at 123 (citing decisions by the United States Courts of Appeals for the Eighth, Ninth, and Eleventh Circuits). The Second Circuit explained that it had "never held that a district court may enjoin the infringement of unregistered copyrights so long as the underlying action arises from a registered copyright held by the same party." Id. It further stated:

> [E]ven if injunctive relief against infringement of an unregistered copyright is available, that relief is properly limited to situations . . . where a defendant

has engaged in a pattern of infringement of a plaintiff's registered copyrights and can be expected to continue to infringe new copyrighted material emanating in the future from the plaintiff. That sort of prophylactic relief furthers the purposes of the Copyright Act generally and does not undermine the intended effect of section 411(a).

Id. (citing Olan Mills, 23 F.3d at 1349); see also Walker Mfg., Inc. v. Hoffmann, Inc., 220 F. Supp. 2d 1024, 1039–40 (N.D. Iowa 2002) (discussing and applying Olan Mills).

The United States Court of Appeals for the Ninth Circuit has articulated an even more expansive standard, albeit one that was rejected by the Second Circuit, and not addressed by the Supreme Court in Muchnick. Compare Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146, 1154 n.1 (9th Cir. 2007), with In Re Literary Works, 509 F.3d at 123 ("To the extent that Perfect 10, Inc. suggests a broader exception, we decline to follow it."). In Perfect 10, Inc., one of the defendants "argue[d] that [the Ninth Circuit] lack[ed] jurisdiction over the preliminary injunction to the extent it enforces unregistered copyrights." Perfect 10, Inc., 508 F.3d at 1154 n.1. The Ninth Circuit explained:

Registration is generally a jurisdictional prerequisite to a suit for copyright infringement. But section 411 does not limit the remedies a court can grant. Rather, the Copyright Act gives courts broad authority to issue injunctive relief. Once a court has jurisdiction over an action for copyright infringement under section 411, the court may grant injunctive relief to restrain infringement of any copyright, whether registered or unregistered.

Because at least some of the Perfect 10 images at issue were registered, the district court did not err in determining that it could issue an order that covers unregistered works. Therefore, we have jurisdiction over the district court's decision and order.

Id.

On the other hand, several other courts have concluded that registration is a prerequisite to seeking both damages and injunctive relief. See, e.g., La Resolana Architects, PA v. Clay Realtors Angel Fire, 416 F.3d 1195, 1204 (10th Cir. 2005), abrogated by Muchnick, 130 S. Ct. at 1237 ("Every remedy outlined in Title 17, including injunctions, is conditioned upon a copyright owner having registered the copyright."); Leland Med. Centers, Inc. v. Weiss, No. 4:07cv67, 2007 WL 2900598, at *2 (E.D. Tex. Sept. 28, 2007) ("A copyright claim must be correctly registered prior to filing suit for injunctive relief or damages."); TVI, Inc. v. INFOSoft Techs., Inc., No. 4:06CV00697JCH, 2006 WL 2850356, at *5 (E.D. Mo. Sept. 29, 2006) (pre-Muchnick decision denying motion for preliminary injunction with respect to unregistered works for lack of subject-matter jurisdiction); Boyds Collection, Ltd. v. Bearington Collection, Inc., 360 F. Supp. 655, 659 (M.D. Pa. 2005) ("Once approved, a copyright registration permits its owner to enjoin others from marketing the subject designs without permission.") (emphasis added); Abbott v. Tyson, No. Civ.A. 01-0111-CV-S, 2001 WL

228169, at *1 (S.D. Ala. Feb. 16, 2001) (noting that the requirements of "[s]ection 411(a) make[] no distinction between actions for injunctive relief and actions for damages," and that "[n]othing in § 502(a) implies that actions seeking injunctive relief are exempt from the registration requirement of § 411(a)"). However, it must be noted that many of these courts reached that conclusion on the basis of pre-Muchnick jurisprudence, which considered § 411(a)'s requirement to be jurisdictional in nature.

At least one other court in this District has addressed this question, though that decision was also issued before the Supreme Court's decision in Muchnick. See Balzer & Assocs., Inc. v. Union Bank & Trust Co., Civ. Action No. 3:09CV273-HEH, 2009 WL 1675707, at *3-4 (E.D. Va. June 15, 2009). In Balzer, the court reasoned that "[t]o maintain an action for infringement under § 501 and to obtain an injunction under § 502, [a] [p]laintiff . . . must first register its copyright as required by § 411(a). The court there emphasized that § 502(a) provides no cause of action for copyright infringement independent of § 501, and instead only authorizes "[a]ny court having jurisdiction of a civil action arising under this title" to "grant temporary and final injunctions." 17 U.S.C. § 502(a); see also Balzer, 2009 WL 1675707, at *3. Of course, in light of

64

Muchnick, the jurisdictional language in § 502(a) is no longer an absolute bar to the availability of injunctive relief.

As noted above, the Supreme Court's decision in Muchnick did not address the availability of injunctive relief for unregistered works, and it does not appear that the Fourth Circuit has ruled on this particular issue, either before or after Muchnick. See Balzer, 2009 WL 1675707, at *4 (noting that the sole unpublished Fourth Circuit decision cited by the plaintiff did not involve unregistered works). In the absence of binding precedent to the contrary, and in light of Muchnick's recognition of the existence of subject-matter jurisdiction with respect to unregistered works, this Court follows the majority of the United States Courts of Appeals that have considered this issue, and concludes, in light of the fact that at least some of plaintiff's designs contained in the Property were registered, that it has the authority to enjoin defendants' infringement of both the registered and unregistered tattoo designs contained in the Property. In light of defendants' conduct in this case, which manifests a pattern of disregard for plaintiff's copyrights, and notwithstanding the representations by defendants' counsel that defendants will not further infringe plaintiff's copyrights, see Trial Tr. vol. 2, 287:19–23, the Court finds it appropriate to exercise its authority in this

matter, and will therefore enjoin defendants in the manner and to the extent requested by plaintiff.

## E. Pre- and Postjudgment Interest

The Supreme Court has explained:

> Although Congress has enacted a statute governing the award of postjudgment interest in federal court litigation . . . there is no comparable legislation regarding prejudgment interest. Far from indicating a legislative determination that prejudgment interest should not be awarded, however, the absence of a statute merely indicates that the question is governed by traditional judge-made principles.

City of Milwaukee v. Cement Div., Nat'l Gypsum Co., 515 U.S. 189, 194 (1995) (8-0 decision) (internal citation omitted); see also Rodgers v. United States, 332 U.S. 371, 373 (1947) (explaining that "the failure to mention interest in statutes which create obligations has not been interpreted by this Court as manifesting an unequivocal congressional purpose that the obligation shall not bear interest," but that "in the absence of an unequivocal prohibition of interest . . . this Court has fashioned rules which granted or denied interest on particular statutory obligations by an appraisal of the congressional purpose in imposing them and in the light of general principles deemed relevant by the Court") & Bd. of Comm'rs of Jackson Cnty. v. United States, 308 U.S. 343, 352 (1939) ("interest is not recovered according to a rigid theory of compensation for money

withheld, but is given in response to considerations of fairness" and "denied when its exaction would be inequitable").

With regard to plaintiff's breach of contract claim, the award of prejudgment interest is a matter within the Court's discretion. See, e.g., Hitachi Credit Am. Corp. v. Signet Bank, 166 F.3d 614, 632-33 (4th Cir. 1999) (noting, in a breach of contract action before the court under diversity jurisdiction, that "[w]hether prejudgment interest should be awarded under [Virginia Code] § 8.01-382 is a matter within the sound discretion of the district court"). In light of TAT's long history of non-compliance with the terms of the Agreement, the Court finds an award of interest to be appropriate. In the absence of any request by plaintiff for a particular interest rate, the Court will award prejudgment interest as detailed below at an annual rate of six percent (6%), which is the Commonwealth of Virginia's standard judgment interest rate, see Va. Code Ann. § 6.2-302 (2010), and postjudgment interest is also awarded pursuant to, and at the interest rate provided by, 28 U.S.C. § 1961.

With regard to plaintiff's copyright infringement claim, the Court notes that, despite the absence of any explicit reference to the availability of prejudgment interest in the text of the Copyright Act, several United States Courts of Appeals have determined that prejudgment interest may be awarded

67

on copyright infringement claims. See, e.g., William A. Graham Co. v. Haughey, ___ F.3d ___, 2011 WL 1833238, at *4–6 (3d Cir. May 16, 2011) (relying on, inter alia, City of Milwaukee in holding that "prejudgment interest is available in copyright cases at the District Court's discretion," to be exercised "with the statute's policy goals in mind" and "in light of 'considerations of fairness'") (quoting Pignitaro v. Port Auth., 593 F.3d 265, 274 (3d Cir. 2010)); Powell v. Penhollow, 260 F. App'x 683, 691 & n.7 (5th Cir. 2007) (unpublished per curiam decision) (collecting cases and remanding the matter to the discretion of the court below); Polar Bear Productions, Inc. v. Timex Corp., 384 F.3d 700, 716–18 (9th Cir. 2004) ("prejudgment interest may be necessary at times to effectuate the legislative purpose of making copyright holders whole and removing incentives for copyright infringement"); McRoberts Software, Inc. v. Media 100, Inc., 329 F.3d 557, 572 (7th Cir. 2003) (noting that prejudgment interest, especially in cases involving willful copyright infringement, is "necessary to make the plaintiff whole and discourage delay by the defendant in making reparations"); Kleier Adver., Inc. v. Premier Pontiac, Inc., 921 F.2d 1036, 1040–42 (10th Cir. 1990) ("prejudgment interest is available to plaintiffs under the Copyright Act"); 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 14.02[C][1] (Matthew Bender, Rev. Ed.) ("the trend may currently be towards

awards of prejudgment interest generally in federal courts")
(internal citations omitted); see also U.S. Payphone, Inc. v.
Executives Unlimited of Durham, Inc., 931 F.2d 888, 1991 WL
64957, at *4 & n.6 (4th Cir. 1991) (unpublished per curiam table
decision including retired Associate Justice Lewis F. Powell,
Jr. of the Supreme Court, sitting by designation) (noting that
"[t]he Copyright Act of 1976 does not provide for prejudgment
interest" and that "[s]everal courts have refused to grant
prejudgment interest in cases arising under the Copyright Act of
1976," but "recogniz[ing] that, even in the absence of
legislative direction, a court may award it if necessary to
further a statute's purposes" and, without "intend[ing] to state
a universal rule," concluding that, in that particular matter,
"the award to [the copyright holder] of its actual damages plus
[the infringer]'s profits, if any, will sufficiently compensate
[the copyright holder] for its loss, and, since the infringement
was not intentional, any additional sanction would serve no
purpose."); cf. Quesinberry v. Life Ins. Co. of N. Am., 987 F.2d
1017, 1030 (4th Cir. 1993) (noting that although "ERISA does not
specifically provide for pre-judgment interest . . . absent a
statutory mandate the award of pre-judgment interest is
discretionary with the trial court"). But see John G.
Danielson, Inc. v. Winchester-Conant Props., Inc., 322 F.3d 26,
51 (1st Cir. 2003) (holding that district court did not abuse

its discretion by failing to award prejudgment interest); Robert R. Jones Assocs., Inc. v. Nino Homes, 858 F.2d 274, 282 (6th Cir. 1988) (holding that, in the absence of any statutory authorization, prejudgment interest is not available under the Copyright Act). This Court will follow the majority of the United States Courts of Appeals—including the apparent implication of the Fourth Circuit's unpublished decision in U.S. Payphones—in holding that an award of prejudgment interest is available in connection with plaintiff's copyright infringement claim.

Turning to the separate question of whether such an award of prejudgment interest is appropriate in this matter in light of considerations of fairness and Congressional intent, the Court notes that defendants' counsel agreed during the June 17, 2011 telephonic status conference that an award of prejudgment interest on plaintiff's copyright infringement claim would be available, but argued that such an award was not warranted by the facts of this matter, and would not be necessary to further the Congressional intent manifest in the Copyright Act. Upon review of the record of this case, the Court disagrees with the arguments of defendants' counsel, and instead concludes that the circumstances of the instant matter merit an award of prejudgment interest at the 6% rate discussed above. As previously noted, defendants' development and continued

marketing of the infringing Original Collection, even after receiving the termination letter from plaintiff, among other facts, shows that defendants' conduct in this matter falls closer to the willful end of the spectrum than the innocent end, if not quite close enough to merit enhanced statutory damages for willful infringement. Thus, in light of defendants' conduct, an award of prejudgment interest would hardly be unfair or inequitable to them. Moreover, defendants' conduct vis-à-vis plaintiff throughout their entire relationship, including the lawsuits in this Court, has been characterized by delay at virtually every step. Thus, an award of prejudgment interest in this matter would also be consistent with Congressional intent, as expressed in the Copyright Act, to deter both infringement itself and delay by infringers in making copyright holders whole. The Court will also award postjudgment interest in this connection pursuant to, and at the interest rate provided by, 28 U.S.C. § 1961.

## IV.  CONCLUSION

### A.  Plaintiff's Request for Attorney's Fees

Plaintiff has requested an award of attorney's fees.  See Docket No. 59 at 35.  Pursuant to Rule 54(d)(2)(B)(i) of the Federal Rules of Civil Procedure, plaintiff shall file a motion for an award of attorney's fees in connection with this matter, attaching all invoices, indicia of the reasonableness of the fee

71

request and the relevant market rates, and other required supporting documents, no later than fourteen (14) days after entry of these Findings of Fact and Conclusions of Law. Pursuant to Rule 58(e), the Court **ORDERS** that plaintiff's request for attorney's fees in its proposed findings of fact and conclusions of law, and any motion filed by plaintiff for attorney's fees as detailed above, shall have the same effect under Rule 4(a)(4) of the Federal Rules of Appellate Procedure as a timely motion under Rule 59 of the Federal Rules of Civil Procedure, extending the time to file an appeal in this matter to run from the date of entry of this Court's Final Order on plaintiff's motion for attorney's fees.

## B. Awards of Damages

### 1. Defendants' Breach of the Agreement

Counsel for all parties are hereby **ORDERED** to coordinate to file with the Court within fourteen (14) days after entry of these Findings of Fact and Conclusions of Law a joint stipulation (the "Joint Stipulation") of the total amount of prior royalty payments by TAT that have already been received and accepted (i.e., deposited) by plaintiff or plaintiff's counsel from TAT as of the date of its filing. See, e.g., Tr. Ex. 48. In addition to such total amount, the Joint Stipulation shall indicate the dates on which each prior royalty payment was made by TAT and accepted by plaintiff or plaintiff's counsel,

the amount of each such payment, the calendar year to which each such payment related, and, in the case of a payment that related to multiple calendar years, a breakdown of which portions of such payment related to which calendar years.

On the basis of the Court's findings of fact and conclusions of law contained herein, the Clerk is **DIRECTED**, after entry of this Court's Final Order on plaintiff's request for attorney's fees, to enter judgment in favor of plaintiff and against TAT in the total principal amount of $20,250.00, less the total amount of prior royalty payments listed in the Joint Stipulation, for minimum royalties due from TAT to plaintiff under the Agreement. This total principal amount consists of $6,000 each for the calendar years 2006, 2007, and 2008, as well as $2,250 for the period from January 1, 2009 through May 14, 2009.

The Court also awards plaintiff prejudgment interest at an annual rate of six percent (6%) on the following portions of the total principal amount from the following dates:

- From January 25, 2007 as to $6,000.00 of the total principal amount less the total amount of any prior royalty payments listed in the Joint Stipulation that were paid by TAT during 2006;

- From January 25, 2008 as to $6,000.00 of the total principal amount less the total amount of any prior royalty payments listed in the Joint Stipulation that were paid by TAT during 2007;

- From January 25, 2009 as to $6,000.00 of the total principal amount less the total amount of any prior royalty payments listed in the Joint Stipulation that were paid by TAT during 2008; and

- From May 14, 2009 as to $2,250.00 of the total principal amount less the total amount of any prior royalty payments listed in the Joint Stipulation that were paid by TAT during 2009.

For purposes of calculating prejudgment interest, any prior royalty payments listed in the Joint Stipulation that were paid by TAT and accepted by plaintiff or plaintiff's counsel after December 31, 2009 shall be deducted from the principal amounts relating to each calendar year in reverse chronological order (i.e., deducted first from the $2,250.00 relating to 2009, then from the $6,000.00 relating to 2008, and so on). The Court further awards postjudgment interest on the total principal amount pursuant to, and at the interest rate provided by, 28 U.S.C. § 1961.

## 2. Defendants' Infringement of Plaintiff's Copyrights

On the basis of the Court's findings of fact and conclusions of law contained herein, the Clerk is further **DIRECTED**, also after entry of the Court's Final Order, to enter judgment in favor of plaintiff and against defendants TAT and Knapp, jointly and severally, in the principal amount of $480,000.00 in statutory damages for defendants' infringement of plaintiff's registered tattoo designs. This constitutes statutory damages in the amount of $20,000.00 for each of the 24

74

registered Books from which tattoo designs infringed by defendants were drawn. The Court awards prejudgment interest at an annual rate of six percent (6%) from May 14, 2009 and postjudgment interest pursuant to, and at the interest rate provided by, 28 U.S.C. § 1961.

### C.   Permanent Injunction against Future Infringement

The Court also finds, pursuant to its findings of fact and conclusions of law contained herein, as well as TAT's explicit acknowledgments in paragraph 7.01 of the Agreement, that plaintiff "has suffered an irreparable injury" from defendants' copyright infringement, that the damages hereby awarded "are inadequate to compensate for that injury," that "the balance of hardships" weighs heavily in favor of an equitable remedy for plaintiff, and that "the public interest would not be disserved by a permanent injunction." eBay, 547 U.S. at 391. Consequently, the Court hereby **ORDERS** that defendants TAT and Knapp are hereby **PERMANENTLY ENJOINED** from infringing plaintiff's copyrighted tattoo designs, registered or unregistered, or otherwise violating plaintiff's exclusive rights to such designs by, without limitation, manufacturing, selling, distributing, copying, reproducing, or otherwise deriving any artwork or product from such designs.

### D.    Disposition of Infringing Materials

The Court also **ORDERS** that, within thirty (30) days after entry of this Court's Final Order on plaintiff's motion for attorney's fees, defendants deliver to plaintiff's counsel all infringing materials of any nature in defendants' direct or indirect possession or control, or over which any defendant possesses any current, future, potential, or contingent ownership interest.    Defendants are further **ORDERED** to file with the Court within seven (7) days after such delivery a notice, in the form of either a sworn affidavit or unsworn declaration, made under penalty of perjury pursuant to 28 U.S.C. § 1746, certifying that such delivery included all infringing materials in defendants' possession or control, or over which any defendant possessed any current, future, potential, or contingent ownership interest.    Such notice shall also explicitly account for, in detail, any sale, transfer, gift, conveyance, destruction, disposal, or other manner of disposition of any infringing materials, other than those included in such delivery to plaintiff's counsel and/or accurately accounted for in defendants' January 2011 accounting, during the period from August 1, 2009 through the date of such certification.    Any notice of appeal filed by defendants in connection with this matter shall operate to stay defendants'

obligations of delivery and certification under this section pending resolution of such appeal.

### E. Jurisdiction Retained for Enforcement Purposes

This Court shall retain jurisdiction over the parties in this matter for purposes of enforcing all obligations imposed herein by the Court on the parties, including without limitation the permanent injunction imposed upon defendants.

### F. Redaction of Personal Identifiers

Pursuant to a timely and unopposed motion by defendants' counsel during the June 17, 2011 telephonic status conference, the Court hereby extends the deadline for the parties to review all exhibits admitted into evidence at trial and redact any personal identifiers contained therein, in accordance with Rule 5.2 of the Federal Rules of Civil Procedure and this Court's Local Civil Rule 7(C), to July 1, 2011.

The Clerk is **DIRECTED** to send a copy of these Findings of Fact and Conclusions of Law to counsel for the parties.

**IT IS SO ORDERED.**

/s/ MSD
Mark S. Davis
United States District Judge

June 28, 2011
Norfolk, Virginia